Commonwealth of Pennsylvania, The General State Authority (now known as the Department of General Services) *v.* Osage Company, Inc., Appellant.

Argued March 2, 1976, before President Judge BOW-
MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-
CER, ROGERS and BLATT. Judge KRAMER did not partici-
pate.

*James C. Larrimer*, with him *Dougherty, Larrimer &
Lee*, for appellant.

*David W. Reager*, Assistant Counsel, with him *Arnold
L. Wainstein*, Assistant Counsel, *Richard D. Holahan*,
Assistant General Counsel, and *Michael A. Madar*, Chief
Counsel, for appellee.

OPINION BY JUDGE WILKINSON, April 7, 1976:
This case is an appeal from a decision by the Board
of Arbitration of Claims (Board) which denied claims
by appellant for certain items of additional expense it
incurred under a contract with the General State Au-
thority (GSA) (now the Department of General Serv-
ices). We affirm in part and remand to the Board for
further proceedings.

On October 18, 1968, appellant, as successful bidder,
executed a contract with the GSA for the general con-
struction of a marina channel and jetties at Presque Isle
State Park in Erie County. As the contractor, appellant
was required to dredge the marina channel in areas and

to elevations indicated on the contract drawings. Upon commencing the dredging operation, appellant discovered that the elevations of the channel bottom to be dredged were actually higher than those stated in the drawings, thus necessitating the dredging of a greater quantity of material than appellant anticipated. Appellant was also required to install soil-cement pavement at various locations in the park. Following the initial installation of the pavement, the GSA informed appellant that the soil-cement material did not meet contract specifications and directed appellant to remove the pavement and make another installation. Appellant complied.

By writing dated July 14, 1970, subsequent to the completion and final inspection of the project, appellant submitted a list of claims to the GSA, which included damages related to the extra dredging of the channel and to the rejection of the first soil-cement pavement installation.[1] The GSA denied the claims and appellant filed a complaint with the Board. Hearings were held in September, 1974, and January, 1975, at which extensive testimony was taken and numerous exhibits introduced. The Board refused the claims that grew out of the extra dredging and the rejection of the pavement installation.[2] Appellant is now before this Court challenging that refusal.

## DREDGING

Citing language contained in paragraphs 8 and 9 of the "Special Requirements" incorporated into the contract and our decision in *Department of Transportation v. Acchioni and Canuso, Inc.*, 14 Pa. Commonwealth Ct.

---

1. Appellant also presented claims for additional clearing, grubbing and scalping of the land which the GSA requested it to perform.

2. The Board, however, awarded appellant $34,003.13 with interest for damages resulting from the additional clearing, grubbing and scalping. The GSA has not contested this award.

596, 324 A.2d 828 (1974), the Board denied the claim for additional costs resulting from the extra dredging. Paragraph 9 expressly places the risk for the accuracy of all data concerning subsurface conditions on the contractor.[3] In *Acchioni and Canuso, Inc.*, we held that similar language precluded a contractor from additional compensation although the contractor relied on subsurface information provided it by the Department of Transportation which subsequently proved erroneous. Paragraph 8 states that excavation done under the contract is "unclassified" and that "[n]o extra or additional compensation will be paid for excavation under this contract."[4] Accordingly, the Board held that appellant as-

----

3. Paragraph 9 provides:

"Any available data concerning subsurface materials or conditions which is based upon soundings, test pits or test borings has been obtained by the retained Engineers for their own use in designing this Project. Its accuracy or completeness is not guaranteed by The Authority or the Engineers and in no event is it to be considered as part of the contract plans or specifications. Contractors must assume all risks in excavating for this Project and shall not be entitled to rely on any subsurface information obtained from the retained Engineer, or indirectly from The Authority. Bidders shall therefore make their own investigation of existing subsurface conditions and if they do not do so, The Authority will not be responsible in any way for the consequences. Said subsurface information is available at the office of the retained Engineers, and prospective bidders may obtain this information by applying to the retained Engineers. Bidders will be required to sign a standard form of receipt for this subsurface information; and such bidders accept such subsurface information in accord with the provisions of this section."

4. Paragraph 8 provides in full:

"Excavation under this contract is unclassified, and includes (without limitation thereto) the excavation and removal of all soil, shale, rock boulders, existing foundations, fill, and every kind of subsurface condition encountered in the contract area. No extra or additional compensation for excavation will be paid under this contract."

sumed the risk that the elevations shown on the contract drawings may differ from the actual levels of the channel bottom.

Appellant, however, argues that the elevations contained in the drawings do not constitute "subsurface information" as contemplated by paragraph 9, and that paragraphs 8 and 9 relate only to "excavation," not to "dredging."[5] Rather, appellant contends that paragraph 21 of the "General Construction" specification and paragraph 27 of the "General Conditions" actually require the contractor to rely on the elevations.

Paragraph 21 provides:

"The Contractor shall remove material by dredging from the areas and to the elevations as shown on the drawings, and shall deposit the dredged material as required for fills. Dikes shall be built and maintained by the Contractor for the retention of hydraulically placed material."

Paragraph 27 states:

"The Contractor shall employ a competent Engineer satisfactory to The Authority to lay out the work from the initial points of instruction as given by The Authority and he shall take as a basis the figures on the plans, and shall lay out all intersections, all building lines at corners and centers, test and check all elevations and levels, locate levels and plumb lines of walls, beams and columns and other parts of the construction as the work progresses. All work of every description shall be laid out by the Contractor, who will be held solely responsible for its correctness, and all expenses in connection with this work shall be paid for by the Contractor."

---

5. As indicated by appellant, "excavation" and "dredging" are covered by separate contract provisions, *i.e.*, paragraphs 12 to 20 inclusive of the "General Construction" specification control "excavation," while paragraphs 21 to 26 inclusive control "dredging."

We find that appellant has placed an unwarranted interpretation on the foregoing provisions. Paragraph 21 only directs the contractor to rely on the contract drawings for (1) the locations, *i.e.*, the "areas," in which dredging is to be performed, and (2) the levels, *i.e.*, the "elevations," which are *to result* from the dredging. The language does not direct the contractor to rely on the pre-dredging elevations representing the actual levels of the channel bottom. Indeed, the paragraph expressly states that the contractor is to dredge material *to* the elevations indicated on the drawings, not *from* the elevations. Similarly, paragraph 27 does not direct the contractor to accept blindly the figures on the drawings in laying out the work. Rather, the paragraph provides that the engineer of the contractor is to use such figures only as the initial basis for the work lay out. The engineer is then required to "test and check all elevations and levels," the correctness of which is the sole responsibility of the contractor. Consequently, we reject appellant's contention that it was required to rely on the elevations shown on the contract drawings and hold, as did the Board, that appellant assumed the risk of any discrepancy between those elevations and the actual levels of the channel bottom.[6]

However, we need not go as far as the Board and hold that appellant specifically undertook that risk under paragraphs 8 and 9 of the "Special Requirements." It is fundamental that "a contractor is presumed, in the absence

---

6. Additionally, our review of the contract materials indicates that paragraph 2 of the "Instructions to Bidders" and paragraph 14 of the "General Conditions" place the responsibility on the contractor to become familiar, by personal examination of the site, with the nature and location of the work, the conformation of the ground, and the soil and rock conditions. Moreover, paragraph 16 of the "General Conditions" states that the contract drawings "are for the purpose of *illustrating* the *general* character and extent of the work. . . ." (Emphasis added.)

of an express provision to the contrary, to have assumed the risk of unforeseen contingencies arising during the course of the work, unless performance is rendered impossible by an act of God, the law, or the other party." *O'Neill Construction Co., Inc. v. Philadelphia,* 335 Pa. 359, 361, 6 A.2d 525, 526-27 (1939) ; *accord, Department of Transportation v. Acchioni and Canuso, Inc., supra.* Since neither the provisions cited by appellant nor any others contained in the contract materials are contrary, and since an act of God, the law or the GSA is not involved, this presumption applies to the channel bottom elevations and is controlling. Thus, it is unnecessary to decide whether appellant specifically, under paragraphs 8 and 9, assumed the risk that the actual elevations may differ from those in the drawings when, absent those paragraphs, appellant is nonetheless presumed to have borne that risk.

## SOIL-CEMENT

Citing paragraph 69 of the "General Construction" specification, the Board held that appellant was not entitled to damages resulting from the rejection of the first soil-cement pavement installation. Paragraph 69 requires the contractor to have five tests performed on a trial mix of material it intends to use for soil-cement by a GSA approved laboratory, the results of which are to be submitted by the contractor to the GSA.[7] The Board found

---

7. Paragraph 69 provides:

"The Contractor shall submit to the Authority and the Engineer for approval, computations of the mix and the range of material graduation he proposes to use. The submission shall be accompanied by reports of tests conducted on the trial mix by an approved laboratory including the following items:

    "(a) Graduation of soil.

    "(b) Moisture-density relations of soil-cement mixture in accordance with AASHO Designation: T 134 (ASTM: D 558).

that appellant began pouring the first soil-cement pavement before all five tests were completed on a trial mix, thereby failing its duty under paragraph 69.[8]

Appellant admits its responsibility under paragraph 69 and that it poured, albeit unwittingly, the soil-cement before all tests were completed. However, contending constructive fraud and interference with contract by the GSA, appellant argues that it was not responsible that all tests were not performed at the time of the initial cement installation. Particularly, appellant alleges, and presented evidence at the hearings, that the GSA, through separate contracts with the testing laboratory, maintained exclusive control over the testing processes and distribution of the results thereof;[9] that appellant submitted a trial mix to the GSA for the performance of all five tests; that the GSA represented to appellant that all tests had been performed and that the trial mix had met the specifications; and that the GSA participated in scheduling the installation of the soil-cement pavement by appellant without notifying appellant that all tests had not actually been completed.

> "(c) Wetting and drying test of compacted soil-cement mixture in accordance with AASHO Designation: T 135 (ASTM: D 559).
>
> "(d) Freezing and thawing tests of compacted soil-cement mixture in accordance with AASHO Designation: T 136 (ASTM: D 560).
>
> "(e) Compressive strength of soil-cement mixture after 7 days moist curing in accordance with ASTM Designation D 1633."

8. It clearly appears from the record that three tests required by paragraph 69, tests "(b)," "(d)" and "(e)," were performed on the trial mix, and that one test, test "(c)," was not. It is unclear, however, whether the gradation test, test "(a)," was actually done.

9. The record indicates that the GSA had the power to increase or decrease the number of tests to be done on the soil-cement trial mix, and that results of all tests were to be sent only to the GSA and its engineer, not to appellant.

We have carefully reviewed the contract materials and find that appellant had undertaken substantial risks which, however, did not include affirmative misrepresentations by the GSA regarding the testing of soil-cement material as required by paragraph 69. Nevertheless, we cannot determine the merits of appellant's contentions since the Board failed to make any findings and conclusions on these issues.[10] Consequently, we have no alternative but to vacate that portion of the Board's order denying appellant's claim for damages resulting from the rejection of the first soil-cement pavement installation and to remand to the Board for further proceedings.[11]

Accordingly, we enter the following

### ORDER

Now, April 7, 1976, the order of the Board of Arbitration of Claims, at Docket No. 302, dated September 17, 1975, is hereby affirmed except as follows:

That portion of the order denying the claim of appellant herein for damages resulting from the rejection of the first soil-cement pavement installation is hereby vacated, and the record in this case is hereby remanded to the Board of Arbitration of Claims with directions to make appropriate findings of fact and conclusions of law and to enter an order thereon concerning appellant's allegations of constructive fraud and interference with contract by the General State Authority (now the Department of General Services).

---

10. Our scope of review is limited and we must affirm the order of the Board unless it is not in accordance with the law or the findings of fact are not supported by substantial evidence. *Penn-Jersey Contractors, Inc. v. General State Authority,* 12 Pa. Commonwealth Ct. 203, 315 A.2d 920 (1974).

11. We note that appellant had raised the issues of constructive fraud and interference with contract by the GSA in the proceedings before the Board.