In re CREATIVE CONSERVATION, INC. d/b/a G & M Hydrogrow, Debtor.

CREATIVE CONSERVATION, INC. d/b/a G & M Hydrogrow, Plaintiff,

v.

TOWNSHIP OF RIDLEY, Defendant.

Bankruptcy No. 91–11276S.
Adv. No. 91–0245S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 29, 1991.

Stephen Raslavich, Philadelphia, Pa. and Peter J. Rohana, Jr., Media, Pa., for debtor.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The instant adversary proceeding is an accounts receivable action instituted by the Debtor, CRL...TIVE CONSERVATION, INC. t/a G & M HYDROGROW, a landscape and excavation contractor ("the Debtor"), on April 5, 1991, against the TOWNSHIP OF RIDLEY, a municipality located in Delaware County, Pennsylvania ("the Defendant"), in the course of the Debtor's voluntary Chapter 11 bankruptcy case, which was filed on March 6, 1991. This proceeding was heard on a must-be-tried basis on a July 17, 1991, after two prior continuances.

2. The Debtor seeks an alleged balance of payments due from the Defendant arising from a written Proposal & Contract ("the Contract") executed on or about September 24, 1990, and effected upon the Debtor's successful sealed bid on the Contract. In its Complaint for Turnover of Property Pursuant to 11 U.S.C. § 542(b) ("the Complaint"), the Debtor requests payment in the amount of $12,404.00, plus interest. However, in its post-trial submission of Proposed Findings of Fact and Conclusions of Law ("the Debtor's Findings"), the Debtor claims an unpaid balance of $12,998.80, as delineated below:

| | | |
|---|---|---:|
| Amount billed: | | $22,943.00 |
| Less payments received: | (−) | 10,539.00 |
| Credit for work not completed: | (−) | 1,235.00 |
| "Additional quantities" at agreed-upon unit prices: | (+) | 1,829.80 |
| Total Balance | | $12,998.80 |

According to the testimony of one of two brothers who are the principals of the Debtor and who is employed as its financial officer, Mark Stein ("Mark"), the "additional quantities" referred to represented work

performed by a subcontractor which was invoiced after the Complaint was filed but which, contrary to the recitation in the Debtor's Findings, Mark agreed to waive during the course of the trial. These items were not proven or discussed further at trial. We will therefore not consider them in deciding this matter.

3. The Defendant set forth a different formulation of the account between the parties in its post-trial Proposed Findings of Fact, Discussion and Conclusions of Law, which thusly calculate that the *Defendant* is owed the amount of $3,906.00:

| | | |
|---|---|---|
| Amount of the Contract: | | $22,943.00 |
| Amount paid: | (—) | 10,539.00 |
| Amount paid to Aston Construction Company ("Aston") by the Defendant to complete the Contract: | (—) | 10,510.00 |
| Amount owed to the Defendant as liquidated damages for delay in performance: | (—) | 5,800.00 |
| Amount Owed to Defendant | | $ 3,906.00 |

4. The services contemplated by the Contract were the extension of an existing storm sewer and the installation of piping and inlets at Brooke and Elder Avenues in the Defendant Township ("the Project"). Upon its execution, the Contract became the agreement between the parties, along with the Instructions to Bidders ("the In-

structions"), the General Conditions, and the Special Conditions contained within the Specifications and Bid Documents for the Project ("the Specifications") issued to all prospective bidders. Pursuant to the Contract executed by the Debtor, the Debtor bid $22,943.00 as the amount necessary for performance of the Contract.

5. Pursuant to the terms of the Contract, the Debtor was given thirty (30) "working days" from the date specified in the Notice to Proceed ("the Notice"), dated November 26, 1990, to complete performance of the Contract. In the Contract was a liquidated damages clause which assessed the Debtor $100.00 for every additional "working day" that the work under the contract was not completed beyond the thirty (30) day deadline. Pursuant to liquidated damages clauses in the Instructions and the General Conditions, the Debtor also was given notice of the potential assessment of liquidated damages for delay in performance.[1] Also, pursuant to the terms of the Instructions and the Contract, the Debtor was required to examine the documents/drawings for the Project and visit the Project site.[2]

6. Mark testified that the Debtor did not begin work until the end of December,

---

1. The liquidated damage clause language in the Instructions and the General Conditions varied, to some degree, from the language in the Contract. In the Instructions, the clause reads as follows:

> The Agreement will include a stipulation that the Liquidated Damages will be established in the amount of:
> One Hundred Dollars ($100.00)
> per calendar day after the agreed completion date that the Work is not fully certified by the Engineer as being Substantially Complete as that stage of completion is defined in the Conditions of the Contract.

In the General Conditions section of the Specifications, the clause read:

> Where actual damages for any delay in completion are impossible of determination by reason of the Owner's objection not to terminate the right of the Contractor to proceed, the Contractor and his sureties shall be liable for and shall pay to the Owner the sum of one hundred dollars ($100.00) as fixed, agreed, and liquidated damages for each calendar day of such delay after the date fixed for completion, until the work is completed or accepted....

There is a proviso to this clause, which states that the Owner may assess actual damages if it accepts the work performed by the Contractor and

> if there has been some degree of completion as will in the Owner's opinion make the project reasonably safe, fit, and convenient for the use for which it was intended.

2. Pursuant to Paragraph five (5) of the Instructions, the Debtor was put on Notice that it was required to examine the documents/drawings for the project, to read all other specifications and contract documents, and to visit the site of performance of the Contract. A variation of this notice was included in the "Contractor's Certification" section of the Contract: "[a]ll plans and specifications referred to above [those plans and specifications on file at the Ridley Township Municipal Building] and the site of work have been examined by the Contractor." If the Debtor had any questions, or wished to point out any discrepancies, regarding the plans, specifications, or contract documents, Paragraph ten (10) of the Instructions afforded it the opportunity to voice such concerns prior to bidding.

1990, and that he considered the 30–day period for completion of the Contract to have begun at this time. Mark claimed that the initial delay in commencement of the Project resulted from the forwarding of the wrong Contract form to the Debtor by the Defendant and from the Debtor's failure to receive the Notice. Mark nevertheless admitted that delays also resulted after performance began, which he attributed to the Christmas/New Year holidays and very adverse weather conditions in both January and February, 1991.

Mark further testified that the last time that the Debtor was "on the job" was in the middle to the end of February 1991. He stated that he had received correspondence ("the Letter") dated March 8, 1991, from counsel for the Defendant which states in pertinent part as follows:

> The contract calls for $100.00 per diem liquidated damages and effective today these damages are being assessed against you for non-compliance with the contractual terms. Furthermore, if the project is not substantially completed by Friday, March 15th, the Township will consider you in default and will have the job completed by another contractor an charge the same to your account.

Mark stated that the Debtor had responded to the Letter by requesting an extension for ten (10) to fifteen (15) days to complete the Contract, claiming that it was not completed at that time due to weather conditions and other circumstances beyond its control. Mark testified that the Defendant's counter-response was a further letter from its counsel advising the Debtor that it was removed from the Project, effective March 25, 1991.

7. Gary Stein, Mark's brother and the co-principal of the Debtor who serves as its on-site supervisor ("Gary"), testified more specifically concerning the problems with which the Debtor had been confronted during performance of the Contract, including variant plan specifications and conflicting directions from the engineer and other inspectors as to what work should be performed under the Contract. However, his testimony indicated that the time lost due to the errors in the plan was confined to a total of only several hours.

8. Mark's testimony regarding the severity of the weather conditions during January and February was countered by testimony from Steven V. Smith ("Smith"), a Project Inspector for Charles Catania, Sr., the Defendant's engineer on the Project ("the Engineer"). Smith testified that there was not any unusual weather during the time of performance of the Contract, and that the Debtor's work failed to progress on these occasions (not quantified) when Gary was personally absent from the Project site and left a foreman in charge.

9. Charles J. Catania, Jr. ("Catania"), an on-site employee of the Engineer, provided testimony which purported to fill out certain ambiguities in the Contract terms. Catania stated that "working days" constitute every Monday through Friday of a week, excluding holidays and any days on which significant rain or cold prevents work. In determining if weather conditions justified exclusion of a day as a "working day," Catania referenced local climatological bulletins issued by the National Weather Service which the Engineer regularly received. Catania further stated that every day in which it rained a minimum of one-tenth of an inch or when the temperature was below 32°F, which rendered pouring concrete impossible, were not counted as "working days."

From December 7, 1990, when he claimed that the Debtor started work, until the end of December, Catania calculated, using these weather bulletins, that there were seventeen (17) possible working days, but only fourteen (14) were considered working days. In January, 1991, of twenty-two (22) potential working days, Catania determined that there were eighteen (18) actual working days. With these calculations as a basis, and utilizing December 7, 1990, when the Debtor first had materials on site, as the starting date, Catania concluded that the Debtor's 30–day work deadline ended on January 29, 1991.

Finally, Catania testified that on January 29, 1991, his father, the Engineer's principal, had sent a letter to the Debtor, stating

that the 30–day deadline period had expired, although no such letter was introduced into evidence. Catania did not mention the Letter of March 8, 1991, from the Defendant's counsel to the Debtor, although he did confirm that a notice of termination had been sent to the Debtor on March 25, 1991.

10. Catania also presented an Invoice which he sent to the Debtor in April, 1991, and which he testified provided an estimated itemization of the expenses anticipated to be incurred by the Defendant to complete the Project. This estimate, which Catania based upon fees which he projected would be charged by Aston, a contractor under an annual bidded contract with the Defendant to provide miscellaneous maintenance services, was in the total amount of $13,715.00, itemized as follows:

| | | |
|---|---|---|
| 1. | Street Restoration Bituminous only (2½″) 129 SY | —$1,000 |
| | Full (8″ conc., 2½ Bit.) 9 SY | 450 |
| 2. | Existing inlet repair | 50 |
| 3. | Restoration from new curb @ existing inlet | 80 |
| 4. | Concrete work @ # 703 Brooke Ave. | 570 |
| 5. | New inlet @ corner of Brooke & Elder | 320 |
| 6. | New manhole | 350 |
| 7. | Inlet rear of # 706 Brooke | 50 |
| 8. | Yard drain | 75 |
| 9. | Lawn Restoration | 8,320 |
| 10. | Hedge relocation | 200 |
| 11. | General | 2,250 |
| | | $13,715 |

11. Catania also produced billings from Aston, indicating that it actually completed work at the Project site for $10,510.00, which services, included certain matters not on the estimate, described at Finding of Fact 13, page 735 *infra*. However, neither these billings nor Catania's testimony provided a line-by-line basis for Aston's actual billings for the work to complete the Project.

12. Gary vigorously disputed all of the items on Catania's estimate. Regarding the lawn restoration (Item 9), Gary testified that the area in question was a "mess" and "nothing but a mudhole" largely because the yards were in a low-lying area which retained water. The pictorial exhibits provided by the Defendant bear out Gary's descriptive observations. In the original contract-bidding process, the Debtor bid only $560.00 for 140 square yards of lawn restoration.

As to Item 11, Catania indicated that work in issue involved replanting a yard, flushing a pipe, and performing general clean-up construction material and/or debris. Catania testified that the "flushing" was necessary in order to remove construction debris, mud, and sediment which had gotten into lines. Gary, meanwhile, testified that, when the Debtor departed from the Project site in March, the pipe did not have to be flushed and was covered with "marify fabric" which should prevent debris and sediment from getting in the pipe. It is possible that, during the period between the Debtor's departure from the Project site and the Project's completion, debris, mud, or sediment could have gotten into the pipe. The Plaintiff's pictorial exhibits were inconclusive on the necessity for the pipe "flushing," since all that the exhibits show is a trench covered by what could be the "marify fabric."

Item 1 of the Invoice concerns street restoration. Gary testified that street restoration was a three-part item which required digging of the area to be restored, introduction of concrete of a particular height and strength, and the placement of temporary paving, the first two steps of which he claimed had been done by the Debtor. All the applicable pictorial exhibits show evidence of the installation of the sewer lines and open trenches dug by the Debtor's employees. Gary had testified that there was minimal damage to the street.

Gary also presented testimony and pictures which supported his contentions that Items 2, 3, 5, 6, 7, and 8 on the estimate were completed.

His response to Item 4 appeared to be that, while the Debtor probably did damage the curb in issue, the curb was dilapidated prior to the job and therefore its restora-

tion should not have been the Debtor's responsibility. With respect to Item 10, he agreed that the Debtor had dug out the hedges in question, and offered no reason why they would not have had to have been replaced at the conclusion of the work had the Debtor completed the Project.

13. Not listed in the estimate were Aston's charges of $675.00 and $720.00 for the installation of a yard drain and the removal/replacement of a driveway, respectively. As to the $720.00 charge, Gary testified that the driveway in question was severely cracked prior to the Debtor's work on the Project. Pictorial exhibits substantiated Gary's testimony. As to the $675.00 charge, Gary testified that the Debtor *had* installed the drain. The installation of the drain was corroborated by a photograph.

14. Determination of allowable amounts for the eleven (11) items of damages recited in Catania's estimated invoice is rendered problematic by the fact that the invoice is only an estimate of the cost of completion of the Project, and that the bill for services actually performed by Aston is not itemized on a line-by-line basis. Thus, a totally-accurate comparison between Gary's testimony and the services billed by Aston is impossible. It is particularly difficult to analyze the appropriateness of the relatively low-cost invoice items, many of which were discussed very briefly at trial.

■ A perusal of the pictorial exhibits leads us to believe that the $560.00 figure set forth in the Debtor's bid for restoration of 140 square yards of lawn does not appear sufficient to fix the "mess" created in the yard in issue. Nevertheless, Catania's estimate of $8,320.00 (for 392 square yards of lawn restoration, at $21.22 per square yard), appears excessive. Although Article 28 of the General Conditions permitted the Defendant to charge the Debtor for all "costs and charges incurred by the [Defendant] together with the cost of completing the work under the [C]ontract, [and] shall be deducted from any monies due," it is unconscionable to charge the Debtor for the cost of lawn restoration for 392 square yards of restoration at the rate of $21.22 per square yard charged by Aston. The

Debtor bargained at arms-length for restoration of 140, not 392, square yards of yard and, hence, should not be charged for the additional 252 square yards. This position is supported by Article 6 of the General Conditions which requires that any

[w]ork or materials of a character for which no price is named in the Agreement shall be considered as extra work which shall be done by the Contractor only upon written order signed by the Engineer, at a price to be previously agreed upon in writing by the Contractor and approved by the Owner ... if the Contractor shall fail or decline to perform such extra work as authorized in writing ... the Owner may then arrange for the performance of the work in any manner he may see fit ... [a]ny such extra cost to the Owner ... shall be deducted from the amount due to the Contractor under the terms of the Agreement....

In the instant record, there was no indication of written authorization for, or of the Debtor's refusal to perform, an additional 252 square yards of lawn restoration. Therefore, it would be contrary to the terms of the Contract to permit the Defendant to recover anywhere near to the full amount set forth in Item 9. Thus, the allowable amount to be deducted for the lawn restoration which was not done by the Debtor should be measured by reference to the total square yardage for which the Debtor was responsible, 140 square yards, and the amount Aston charged under the terms of its annual contract with the Defendant, approximately $21.22 ($21.22 × 392 = $8,320.00, the amount claimed owing in Item 9). We therefore determine that the amount allowable to the Defendant for lawn restoration damages is $2,970.80 (140 × $21.22).

■ Because of the inconclusiveness of the Debtor's pictorial exhibits and because we find Catania's testimony to be persuasive on this issue, *see* Finding of Fact 12, page 9 *supra*, we will allow the Defendant's claim of $2,250.00 for the work included in Item 11.

■ As to Item 1 of the Invoice, we will disallow the deduction of the $1,450.00. There does not appear to be any indication, consistent with Article 9 of the General Conditions, which authorizes the Engineer to require the Debtor to remove and replace any defective work or materials at its own cost. Nor is there any indication that the work covered in Item 1 was defective. Also, there was no evidence tending to prove that the work was not completed, such that the Engineer and the Defendant in their own discretion could have the work completed by others, as it did with Aston, and charge the cost to the Debtor.

■ As to the $675.00 charge to install a yard drain, we will disallow deduction of this amount because it is unclear why this item would have been omitted from Catania's estimate if it really were an item which the Defendant felt confident should be included. Also, we find Gary's testimony, and the corroborating pictorial exhibit, to be persuasive on the issue of its proper installation by the Debtor.

■ With respect to the $720.00 charge for the removal and replacement of the residential concrete driveway, we are similarly unable to understand why this item was not included by Catania in his estimate if it were a legitimate item of damage. Also, in light of Gary's testimony, which we find persuasive on this point since it is supported by the pictorial exhibits, and the fact that this item does not appear to have been originally bid upon by the Debtor, we are reluctant to impose liability for such a charge upon the Debtor.

The Debtor provided no persuasive rebuttal to the Defendant's claims of $570 for restoration of concrete work (Item 4) and $200 for hedge relocations (Item 10). Therefore, these items of damages, totalling $770, should be allowed to the Defendant.

## B. CONCLUSIONS OF LAW/DISCUSSION

■ 1. In its Complaint, the Debtor alleged that the controversy before this court is a core proceeding. The Defendant denied this allegation in its Answer. However, at the commencement of the trial, both counsel expressly consented to the determination of this proceeding by this court. Therefore, irrespective of whether the proceeding is or is not core, we may determine it. *See* 28 U.S.C. § 157(c)(2); and Bankruptcy Rule 7012(b).

■ 2. The principal legal issue presented by the instant proceeding is the enforceability of a contract clause providing that a governmental body is entitled to liquidated damages in the event of late performance, when, as here, no evidence of specific damage to the governmental body as a result of the tardy performance has been adduced. *Compare In re Creative Conservation, Inc., Creative Conservation, Inc. v. West Manchester Sewer Authority,* Bankr. No. 91–11276S, Adv. No. 91–0246S, slip op. at 8–10, 1991 WL 165675 (Bankr.E.D.Pa. August 22, 1991) (liquidated damage clauses are clearly enforceable by governmental units when they result in·a sum not disproportionate to actual damages proven).

Under applicable Pennsylvania law, liquidated damages have been "accepted as a necessary part of the substantive law of contracts." *Bruno v. Pepperidge Farm, Inc.,* 256 F.Supp. 865, 869 (E.D.Pa.1966). Liquidated damages have been defined as

the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by good faith effort to estimate in advance the actual damage that will probably ensue from the breach, is recoverable as agreed damages if occurs....

*Commonwealth Dep't of Environmental Resources v. Hartford Accident & Indem. Co.,* 40 Pa.Cmwlth. 133, 137 n. 2, 396 A.2d 885, 888 n. 2 (1979), citing *In re Plywood Co. of PA.,* 425 F.2d 151, 154 (3rd Cir.1970). *See also Bruno, supra,* 256 F.Supp. at 865. Liquidated damage clauses have been deemed to be valid when they recite a sum which represents a "reasonable forecast as to just compensation for an injury that was difficult to estimate at the time [parties] entered into [a] contract...." *Finkle v.*

*Gulf & Western Mfg. Co.,* 744 F.2d 1015, 1021 (3rd Cir.1984).

Following from the latter definition, a liquidated-damages clause has been found unenforceable, because it is deemed to be in the nature of a penalty, when it requires payment of a sum, upon the non-performance, breach, or default of a contract, "that is disproportionate to the value of the performance promised or the injury that has actually occurred...." *Id. See also Plywood Co., supra,* 425 F.2d at 154; *Bruno, supra,* 256 F.Supp. at 869; *In re Jordan,* 91 B.R. 673, 680 (Bankr.E.D.Pa.1988) (and cases cited therein); *Holt's Cigar Co. v. 222 Liberty Associates,* 404 Pa.Super. 578, 591 A.2d 743, 747–48 (1991); and *Hartford, supra,* 40 Pa.Cmwlth. at 137 n. 2, 396 A.2d at 888 n. 2.

Notwithstanding the above principles, several older Pennsylvania cases have carved out a special rule supporting the enforceability of liquidated-damages clauses in favor of governmental units. In *Malone v. Philadelphia,* 147 Pa. 416, 23 A. 628 (1892), a contract between the City of Philadelphia and the plaintiff contractors, regarding the erection of a bridge over the Schuylkill River at Market Street, contained a clause which required completion of the bridge within twelve (12) months after a Notice to Proceed was issued. *Id.,* 147 Pa. at 418, 23 A. at 628. Also, the contract contained a liquidated damages clause which required the contractors to pay the City $50.00 for every day beyond the twelve-month period which it took to complete their engagement. *Id.* The contractors completed performance of the contract beyond the twelve month period, with the assurance by the chief engineer and surveyor that the twelve month completion clause, and the concomitant liquidated damages clause, would not be enforced against it. *Id.,* 147 Pa. at 419, 23 A. at 628.

In affirming the lower court and, hence, enforcing the twelve-month completion and liquidated damages clauses, the *Malone* court noted (1) that the chief engineer and surveyor's power to extend the contract's completion time was exercisable only upon receipt of a specified notice from the con-

tractors, which the court found had not been given; and (2) the grant of the extension of time had not been in writing and for a definite period. *Id.,* 147 Pa. at 420–21, 23 A. at 629. Ignoring the contractors' suggestion that the $50.00 per day liquidated damages clause was a penalty, the court stated that

the public convenience required the erection of the bridge, and that the loss resulting to the public from the want of it would amount to more than the cost of construction and maintenance ... how much more than the cost of construction the public inconvenience would amount to in dollars and cents it would be difficult, not to say impossible, to estimate. This difficulty brings the stipulation within the well-settled rule that it will be inferred that parties intended a sum agreed to be paid upon breach of a contract as liquidated damages, whenever the damages are uncertain and not capable of being ascertained by any satisfactory rule.

*Id.,* 147 Pa. at 421, 23 A. at 629. This "public inconvenience" argument was similarly applied to validate the enforcement of liquidated-damages clauses in subsequent cases involving contractors and public bodies. *See, e.g., Wells v. Philadelphia,* 270 Pa. 42, 48, 112 A. 867, 869 (1921); *Curran v. Philadelphia,* 264 Pa. 111, 116–18, 107 A. 636, 638–39 (1919); *Egolf v. York,* 246 Pa. 455, 459, 92 A. 695, 696 (1914); and *York v. York Rys. Co.,* 229 Pa. 236, 242, 78 A. 128, 131 (1910).

In more recent cases, a different analysis, albeit reaching the same conclusion as the "public inconvenience" argument, has been utilized by courts to validate liquidated-damages clauses in favor of governmental bodies, even where the damages assessed bear little or no relation to actual damages resulting from the non-performance, breach, or default of a contract. *Cf. Thomas H. Ross, Inc. v. Seigfreid,* —— Pa.Super. ——, —— ——, 592 A.2d 1353, 1356–57 (1991) (similar reasoning upholding the enforceability of such a contract provision applied to a contract involving private parties).

In *Sutter Corp. v. Tri–Boro Municipal Authority*, 338 Pa.Super. 217, 487 A.2d 933 (1985), the Superior Court affirmed the lower court's holding that the defendant municipal authority, a quasi-public body, should be awarded $59,300.00 in liquidated damages as a result of the plaintiff-contractor's completion of a sewage treatment plant 296.5 days behind schedule. The plaintiff had entered into a contract with the defendant to construct an upgraded sewage treatment plant and pumping station. *Id.*, 338 Pa.Super. at 220, 487 A.2d at 934. Included in the contract was a liquidated damages clause which required completion of the work within 365 days of the date stated in the Notice to Proceed, July 1, 1974. *Id.* If the plaintiff were unable to complete performance during the specified period, the defendant would be permitted to keep, as liquidated damages, $200.00 for each day, not including Sundays and holidays, that the work was delayed. *Id.*, 338 Pa.Super. at 220–21, 487 A.2d at 934. Although the plaintiff was given an extension to October 31, 1975, it was still unable to complete performance until December 1, 1976. *Id.*, 338 Pa.Super. at 221, 487 A.2d at 934. As a result of the plaintiff's delay, the defendant retained $59,300.00 as liquidated damages. *Id.*, 338 Pa.Super. at 221, 487 A.2d at 935.

After finding that the plaintiff had not completed performance until December 1, 1976, and denying its argument that any assessed liquidated damages should be apportioned among other contractors involved in the project, the court found that the liquidated damages clause was not unconscionable and enforceable. *Id.*, 338 Pa.Super. at 223, 487 A.2d at 936. This holding was premised upon two facts: (1) the plaintiff "was an experienced contractor which dealt with defendant at arms's length;" and (2) the plaintiff's officers understood the terms of the contract. *Id.*

In *Commonwealth Dep't of Transportation v. Interstate Contractors Supply Co.*, 130 Pa.Cmwlth. 334, 568 A.2d 294 (1990), the Commonwealth Court based its finding that a liquidated damages clause was enforceable upon the holding in *Sutter Corp.* and upon an examination of the subject contract. In *Interstate Contractors*, the plaintiff contractor's performance of a contract, involving the painting and cleaning of six bridges in Allegheny county, was delayed by inclement weather including flooding. *Id.*, 130 Pa.Cmwlth. at 336, 568 A.2d at 294. Like the contract in *Sutter Corp.*, there was a liquidated damages clause which provided the assessment of $200.00 per day liquidated damages for each day, beyond the contract deadline, that the plaintiff failed to complete the work under the contract. *Id.*, 130 Pa. Cmwlth. at 336, 568 A.2d at 295. Therefore, taking into consideration a seven day extension granted by the defendant, the defendant imposed liquidated damages of $200.00 per day for forty-seven (47) days and partial liquidated damages of $50.00 per day for eight days. *Id.*

The Commonwealth's Board of Claims ("the Board") had found the imposition of the liquidated damages improper because they "were not an estimate of probable damages, but instead a form of punishment designed to prevent breach." *Id.*, 130 Pa. Cmwlth. at 337, 568 A.2d at 295. In overturning the Board's ruling and finding that the liquidated damages were proper, the court concentrated on a reading of the contract, since it felt that,

> [i]n determining whether a liquidated damages clause is an unenforceable penalty, one must examine the entire contract in light of its text, what it is about, the parties' intentions, and the facility of measuring or lack thereof, so as to arrive at an equitable conclusion.

*Id.*, 130 Pa.Cmwlth. at 337, 568 A.2d at 295, citing *Hartford, supra*, 40 Pa.Cmwlth. at 138 n. 4, 396 A.2d at 888 n. 4.

The court noted further that, because the plaintiff's performance was allegedly delayed by inclement weather and because of the existence of a contractual clause assigning the risk of damages, in the absence of language to the contrary, a contractor "is presumed to undertake the burden of unanticipated happenings, absent an Act of God, the law, or the actions of the other party." 130 Pa.Cmwlth. at 338–39, 568 A.2d at 296. The court also thusly found

the plaintiff's experience as a contractor to be highly significant:

> [l]ike the contractor in *Sutter,* Interstate is an experienced contractor who should have known approximately how many working days it would have, due to the prohibition forbidding work on Sundays and holidays and the unpredictability of spring-time weather.

*Id.,* 130 Pa.Cmwlth. at 339, 568 A.2d at 296. Finally, the court found the apparent absence of actual damages, as juxtaposed to the assessment of liquidated damages, not to be significant. *Id.* It felt the absence of actual damages did not make the liquidated damages clause a penalty and echoed *Sutter Corp.'s* holding that "in general, there is no requirement that actual damages be shown so that liquidated damages may be recovered." *Id.*

3. In light of the foregoing state of the applicable Pennsylvania law, we find that liquidated damages may be properly assessed against the Debtor by the Defendant. We are not moved by Mark's statements that weather severity prevented timely performance. Smith testified that the weather was normal for the season. Similar to the contractor at issue in *Interstate Contractors, supra,* 130 Pa.Cmwlth. at 338–39, 568 A.2d at 296, the Debtor, who had been in business for ten (10) years and had constructed approximately a dozen sewer systems in the past two and one-half (2½) years, should have known the approximate number of working days likely during the allotted period of performance under the Contract. Further, Pennsylvania law states that

> a contractor is presumed, in the absence of an express provision to the contrary to have assumed the risk of unforeseen contingencies arising during the course of the work unless performance is rendered impossible by an act of God, the law, or the other party.

*O'Neill Construction Co., Inc. v. Philadelphia,* 335 Pa. 359, 361, 6 A.2d 525, 526–27 (1939). *See also F.J. Busse, Inc. v. Department of General Services,* 47 Pa.Cmwlth. 539, 544, 408 A.2d 578, 584 (1979); *Buckley & Co. v. Commonwealth Dep't of Trans-portation,* 34 Pa.Cmwlth. 182, 185, 382 A.2d 1298, 1299 (1978); and *General State Authority v. Osage Co.,* 24 Pa.Cmwlth. 276, 281–82, 355 A.2d 845, 848 (1976).

In the record of this case, there was a pertinent contractual provision which restricted the days to be counted in the contractual time-period to "working days," which gave the Debtor some benefit for unforeseen contingencies. *Compare West Manchester, supra,* slip op. at 7–8 (weather conditions were expressly indicated as *not* being a basis for extension of the contract time-period; weather conditions could be considered).

Finally, this case is not as difficult for the Defendant to sustain its position as in *Malone.* No agent of the Defendant ever suggested that the Defendant would waive the liquidated-damages clause.

4. Nevertheless, the disputes over when the Debtor began the work; how "working days" are measured; and if weather and other factors interceded to justify eliminating certain dates as "working days" rendered uncertain the measurement of the time-period in which the Debtor was subject to liquidated damages. The only objective statement of when the time-period for imposition of liquidated damages should run is included in the Letter from the Defendant's counsel to the Debtor, which expressly stated that the time for the accrual of liquidated damages did not begin to run until March 8, 1991. We find counsel's manifestation of the Defendant's intention to accrue liquidated damages from March 8, 1991, forward to be clearer and more probative than the testimony of Catania who, with 20–20 hindsight, set the date earlier.

The Debtor can hardly complain about this result. Had we been compelled to attempt to calculate the commencement of this period without the benefit of the Letter, the date might well have been set earlier. No severe weather conditions or other significant factors justifying delay were proven by the Debtor to have occurred after March 8, 1991.

We also hold that the accrual of liquidated damages ended on March 25, 1991, the date which Catania testified was the date when a termination notice was sent to the Debtor. Thus, liquidated damages are assessed against the Debtor for only eighteen (18) days at $100 per day and amount to $1,800.00.

5. As per Finding of Fact 14, pages 735–736 *supra,* the Defendant is entitled to allowable damages of $2,970.80 for lawn restoration, $2,250 for clean-up yard work, and $770 for restoration concrete and hedge work, or a total of $5,990.80.

6. In summation of our foregoing Findings of Fact regarding damages due to the Defendant for non-completion, and our Conclusions of Law regarding the liquidated damages due to the Defendant for delay, the amount owed by the Defendant to the Debtor is $4,613.20, calculated as follows:

| | | |
|---|---|---|
| Contract price | | $22,943.00 |
| Amount paid to Debtor | (−) | 10,539.00 |
| Allowed damages | (−) | 5,990.80 |
| Allowed amount owed from assessment of liquidated damages | (−) | 1,800.00 |
| Net Sum Due | | $ 4,613.20[3] |

C. ORDER

AND NOW, this 29th day of August, 1991, after a trial of this proceeding on July 17, 1991, and upon careful consideration of the record made at the trial and of the post-trial submissions by the parties, it is hereby

ORDERED AND DECREED that judgment is entered in favor of the Plaintiff, CREATIVE CONSERVATION, t/a G & M HYDROGROW, and against the Defendant, TOWNSHIP OF RIDLEY, in the amount of $4,613.20.

---

**3.** The figure is significantly less than the amount sought by the Debtor, *i.e.,* $12,998.80. We therefore conclude that the sum due to the Debtor from the Defendant was not so clearly "fixed" as to entitle the Debtor to any pre-judgment interest in the judgment. *Compare West Manchester, supra,* slip op. at 12–13 (Debtor entitled to pre-judgment when it was awarded well over half of the amount prayed for and

when the contract expressly provided for interest in the event of non-payment). *See In re Creative Conservation, Inc., Creative Conservation, Inc. v. Lott Group, Inc.,* Bankr. No. 91–11276S, Adv. No. 91–0241S, 1991 WL 163739 (Bankr.E.D.Pa. August 21, 1991) (Debtor awarded only about $6,500 out of about $35,000 prayed for; no pre-judgment interest awarded).