**GREEN VALLEY DRY CLEANERS, INC., David Rosenblatt and Gail B. Rosenblatt, Appellants,**

**v.**

**WESTMORELAND COUNTY INDUSTRIAL DEVELOPMENT CORPORATION.**

Commonwealth Court of Pennsylvania.

Argued May 6, 2003.

Decided Sept. 4, 2003.

Reargument En Banc Denied Oct. 22, 2003.

Richard T. Victoria, Pittsburgh, for appellants.

Louis C. Long, Pittsburgh, for appellee.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, JIULIANTE, Senior Judge.

OPINION BY Judge LEAVITT.

Green Valley Dry Cleaners, Inc., David Rosenblatt and Gail B. Rosenblatt (collectively Green Valley), appeal from two orders of the Court of Common Pleas of Westmoreland County (trial court). The first order, dated December 20, 2001, granted the Westmoreland County Industrial Development Corporation's (WCIDC) motion for summary judgment on Green's Valley's negligence and fraud claims on the ground that the WCIDC is a "local agency" entitled to governmental immunity pursuant to Section 8541 of the Judicial Code, commonly referred to as the Political Subdivision Tort Claims Act (Tort

Claims Act), 42 Pa.C.S. §§ 8541–8542.[1] The second order, dated September 12, 2002, granted the WCIDC's motion for post-trial relief, including judgment notwithstanding the verdict (JNOV) on Green Valley's breach of contract claim.

## HISTORY OF THE CASE

In 1983, the Westmoreland County (County) Board of Commissioners established the WCIDC, a nonprofit corporation, to promote economic development in the County and to create jobs for County residents. Although its main focus is the development of industrial parks, the WCIDC is also committed to supporting economic development in the County through its involvement in a number of business assistance programs, transportation projects, special projects, and the redevelopment of abandoned industrial sites. To date, the WCIDC's industrial park system consists of twelve fully developed, strategically located industrial parks, including three redeveloped brownfield sites and nine greenfield sites.

To achieve its stated purpose, the WCIDC obtains federal, state and local grants to purchase tracts of land in the County. It then builds the infrastructure for each new industrial park, including roads, utilities and storm water management systems, and obtains zoning approvals. Once complete, the WCIDC sells the lots to qualified businesses[2] at a discounted price. After the lots are sold, the WCIDC maintains its relationships with the purchasers by conducting routine follow-ups and providing assistance, where appropriate, to help the businesses expand.[3]

The development of Industrial Park IV in North Huntingdon, Pennsylvania, began in 1988. In July of that year, the WCIDC commissioned and received a geotechnical report addressing the subsurface conditions of Industrial Park IV, including Lot 11. The report indicated that the majority of Lot 11 was relatively coal-free.

In April of 1989, the WCIDC contracted with the Macklin Engineering Company (Macklin) to assist in developing Industrial Park IV. In the course of developing the various lots in Industrial Park IV, Macklin discovered sinkholes on Lot 11. This dis-

---

1. Section 8541 of the Tort Claims Act provides:

 Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

 42 Pa.C.S. § 8541.

2. One of the qualifications for purchasing a lot in one of the WCIDC's industrial parks is that the business must employ a certain number of employees and make efforts to expand its employment.

3. The WCIDC is not the sole owner of land in the various County industrial parks. Two other entities, the Redevelopment Authority of Westmoreland County (Redevelopment Authority) and the Economic Growth Connection (Growth Connection) also own parcels in these industrial parks and perform certain functions similar to the WCIDC. Generally, the types of funding offered to prospective buyers of industrial park property dictate which of the three entities will first own the land. For example, the Growth Connection is a nonprofit corporation that provides loans to expanding or new companies within the County. It is a certified development corporation, which entitles it to apply for certain Pennsylvania Industrial Development Authority loans.

The Redevelopment Authority entered into a Cooperation Agreement with the WCIDC and the County to apply for financial assistance under the Capital Budget Redevelopment Assistance Act for various tracts, including the one purchased by Green Valley, Lot 11. This is in accord with the stated purpose of the Redevelopment Authority, which is to provide tax-free loans to companies.

covery is reflected in the following minutes of a June 8, 1992 meeting in which Macklin met with WCIDC representatives:

> *Sinkholes exist on Parcel No. 11* (field designation). The parcel design grade is below the visible bottom of the sinkhole. (Subsequent to the meeting *during the excavation operations, the sinkholes collapsed further, approximately 10–feet, indicating the presence of some type of void.* Macklin Engineering Company is obtaining from the Bureau of Mines the mapping for this area. Mapping consulted by the geotechnical consultant during the project design did not designate any voids in this area.)

Reproduced Record 2227a, 1864a–1865a (R.R. ——) (emphasis added). Contrary to the 1988 geotechnical report, Macklin's investigation further revealed the existence of coal under Lot 11 and Macklin advised the WCIDC as such. Thus, in 1992, the WCIDC was aware that the 1988 geotechnical report, as it related to the existence of coal under Lot 11, was inaccurate.

Macklin subsequently approximated the quantity of coal involved and bids were taken for coal removal. The WCIDC hired Brentzel Contracting, Inc. (Brentzel) to begin excavating the coal to develop Lot 11 for building. During the excavation project, Brentzel discovered ribs and coal stumps that indicated the presence of deep mining. After extracting a portion of the coal from Lot 11, Brentzel was instructed by the WCIDC to stop the excavation because the project was too expensive. Thus, in September of 1992, although aware that additional coal existed on Lot 11, the WCIDC halted the excavation and covered the property with top soil, leaving Lot 11 in two tiers: a lower level under which coal had been excavated and on which a building could be constructed, and an upper level under which coal still remained.

In the first half of 1997, under pressure from its landlord and outgrowing its current facilities, Green Valley sought to move its main dry cleaning plant from McKeesport, Pennsylvania to a new location. In the process of seeking a new location, Mr. Rosenblatt was advised to contact Joseph Sisley, a salesperson for the WCIDC, regarding the availability of possible sites in Industrial Park IV.

Mr. Rosenblatt subsequently contacted Mr. Sisley on July 14, 1997. During their initial conversation, Mr. Rosenblatt explained that he needed 40,000 square feet for his building and "three and a half good acres, that's fully-developed, good quality, ready to go land" so that he could "start as quickly as possible." R.R.1995a. On the same day, Mr. Rosenblatt met with Mr. Sisley at the site of Lot 11. Mr. Sisley explained the WCIDC's business to Mr. Rosenblatt and inquired about the nature of Green Valley's business. Again, Mr. Rosenblatt indicated to Mr. Sisley that the building project needed to be on a "fast track," that he needed land that was "ready" and "fully-developed," and that he was "interested in buying a fully-developed property" on which he could complete building in a period of ten months. R.R. 1996a. Mr. Sisley informed Mr. Rosenblatt that the WCIDC could provide ready to build and ready to go lots on which he could promptly begin construction. R.R. 1996a–1997a.

The following day, July 15, 1997, Kimberly A. Donnelly, Economic Coordinator for the WCIDC, sent a letter to Mr. Rosenblatt confirming the information provided during his meeting with Mr. Sisley. Specifically, Ms. Donnelly advised that "[a] great benefit of locating in one of these parks is that you receive this fully developed property, which has been properly permitted and zoned, at a price that is considerably less than similar privately-

owned property." R.R. 2243a, 1999a–2001a.

On July 16, 1997, Mr. Rosenblatt, along with his architect, Peter Cecconi, met with Mr. Sisley at the site of Lot 11 for the purpose of determining whether the lot was suitable for the new plant. At this time, Mr. Rosenblatt questioned why the property was tiered. Mr. Sisley advised him that "there was some surface coal that was removed from the property during excavation" back to the tier line. R.R. 1962a. He did not advise Mr. Rosenblatt that coal remained on any portion of Lot 11 or that any deep mining had occurred there. Also at this meeting, at Mr. Cecconi's request, Mr. Sisley provided Messrs. Rosenblatt and Cecconi with a copy of the inaccurate 1988 geotechnical report, but he did not advise them of the inaccuracy.

On the following day, July 17, 1997, Mr. Rosenblatt sent a letter to Mr. Sisley offering to purchase Lot 11 for $100,000 and stating, in pertinent part:

> As per our conversation yesterday, nine acres is more than is necessary for our company. Our needs are approximately 3½ good acres. Any extra acreage would be wasted land and would be an ongoing expense to maintain.
>
> * * *
>
> We plan to be under construction by September 1, 1997, and be completed by January 1, 1998. Approximately 75 employees will be relocated to our new Wholesale Facility. We anticipate that this number will grow to 100 in two to three years. . . .
>
> We would like to offer $100,000.00 for the parcel of land you showed us on July 16, 1997.

R.R. 2247a.

By facsimile dated July 21, 1997, Mr. Sisley advised Mr. Rosenblatt that he did not yet have a response to his offer, but that he had briefed the WCIDC's Executive Director, Larry J. Larese, on its terms. Ultimately, by letter dated July 31, 1997, Mr. Sisley informed Mr. Rosenblatt that his offer had been approved by the WCIDC's Board of Directors. He stated, in pertinent part:

> I am pleased to announce to you that your proposal dated July 17, 1997 regarding the purchase of Lot # 11 at the Westmoreland County Industrial Park—IV, North Huntingdon Township, was reviewed and approved by members of the [WCIDC] Board this morning.
>
> * * *
>
> Since it is our understanding that your project is on a "fast track" with hopes to start construction September 1st, of this year, it is our recommendation that we try to meet the August 7th date for review and approval [of the Option Agreement to be executed by the parties].

R.R. 2248a.

On August 7, 1997, Green Valley entered into an Option Agreement with the WCIDC, which was drafted by the WCIDC, and provided Green Valley with a six-month option to purchase Lot 11. While the Option Agreement did provide Green Valley with "the right to make test borings and soil analysis on the subject property," it did not obligate Green Valley to do so. R.R. 2297a. The Option Agreement did not contain an integration clause.

Approximately three weeks after the execution of the Option Agreement, on August 26, 1997, Mr. Rosenblatt contacted Mr. Sisley and requested "the environmental report for the industrial park," "the title report," and "information in regards to coal activity or mine subsidence." R.R. 1973a–1974a. During this conversation, Mr. Sisley did not provide Mr. Rosenblatt

with any information regarding the coal beyond his prior statements that "there was some surface coal that was removed during excavation. That's why they stopped at the tier line...." R.R.1975a–1976a. Shortly after this conversation, Mr. Sisley provided Mr. Rosenblatt with an environmental report and other partial data, but he failed to disclose the WCIDC's actual knowledge of the subsurface conditions.

Green Valley proceeded with its plan to build the new plant on Lot 11. As was required by the WCIDC, Green Valley's building plans identifying the size, design and location of the proposed new plant were submitted to the WCIDC for approval. The WCIDC reviewed the plans and, in a letter dated October 15, 1997, Mr. Sisley advised Mr. Cecconi that, with a few exceptions, the plans were approved. R.R. 2249a. Subsequently, on October 17, 1997, the parties closed on the property. No sales agreement was executed, even though the Option Agreement explicitly contemplated an "Agreement of Sale" in Paragraph 12. R.R. 2297a.

Mr. Rosenblatt chose to purchase Lot 11 from the WCIDC because it was in ready to build condition. Indeed, the assurances and promises that the WCIDC was providing Green Valley with a ready to build lot suitable for immediate construction were given to all prospective buyers. All properties offered by the WCIDC are described as "ready to go," "fully-developed," "quality" properties. R.R.1915a–1919a. In fact, Mr. Larese, the WCIDC's Executive Director, after discussing these "promises" regarding the property sold by the WCIDC, testified as follows:

Q. And we talked about lots being fully-developed, ready to go quality; that sort of thing. Would you agree with me that buying a ... WCIDC lot is essentially insurance that the property that's for sale is for the purposes the client is looking for and it's insurance that it is true? Would you agree with that?

A. Yes.

R.R.1928a.

Construction of the new Green Valley plant began immediately. However, on October 19, 1997, the second day of construction, one of the contractor's bulldozers fell into a sinkhole on Lot 11. Green Valley subsequently determined, through the contractor and others, that some portion of the area underneath Lot 11, including the area where the plant was to be constructed, sat above abandoned deep mines. Consequently, in order to construct the plant, it was necessary to excavate the property, remove the coal associated with the mines, and fill and prepare the property for building. This excavation project, which involved the removal and replacement of some 40,000 tons of debris, could not be completed until late February or early March of 1998.

Green Valley commenced this action on October 6, 1998, by filing a complaint in the trial court. On January 29, 1999, Green Valley filed an amended complaint averring negligence (Count I), fraud (Count III) and breach of contract (Count II). In short, Green Valley alleged that the WCIDC had a duty, contractual or otherwise, to disclose that Lot 11 sat above a significant amount of coal and/or that deep mining had occurred under portions of Lot 11, rendering it unsuitable for supporting the building that Green Valley intended to construct and that the WCIDC had approved.

On August 27, 2001, the WCIDC filed a motion for summary judgment contending that it was a "local agency" entitled to governmental immunity under Section 8541 of the Tort Claims Act. Around the time the parties were preparing and filing

their summary judgment briefs, the Pennsylvania Supreme Court issued its ruling in *Sphere Drake Insurance Co. v. Philadelphia Gas Works,* 566 Pa. 541, 782 A.2d 510 (2001). The trial court subsequently ordered the parties to supplement the record with facts bearing upon the WCIDC's status as a "local agency" consistent with the factors discussed in *Sphere Drake.* As a result, the parties submitted additional briefs and evidence.

By Opinion and Order of Court dated December 20, 2001, the trial court granted the WCIDC's Motion for Summary Judgment in part and dismissed Green Valley's fraud and negligence claims, finding that the WCIDC was a "local agency" under Section 8541 of the Tort Claims Act and, therefore, entitled to governmental immunity. As a result, Green Valley's action against the WCIDC was reduced to a breach of contract claim.

Immediately prior to trial on the breach of contract claim, the parties submitted, briefed and argued certain motions in limine, including the WCIDC's motion to exclude parol evidence on the contract between the parties. The WCIDC argued that evidence of the parties' alleged oral agreements was barred because they had entered into an integrated agreement. After hearing argument on the issue, the trial court denied the WCIDC's motion.

On February 11, 2002, the parties proceeded to trial on Green Valley's breach of contract claim. At the close of Green Valley's case, the WCIDC moved for a nonsuit on the basis that Green Valley failed to present evidence "of what promises allegedly have been breached, let alone evidence of mutual understanding between the parties...." R.R.2086a. The parties argued these issues and, ultimately, the trial court denied the motion. The trial court also denied the WCIDC's motion for a directed verdict.

After the close of the WCIDC's case, the parties presented proposed points for charge and arguments regarding appropriate jury interrogatories and/or special findings. Over the objection of Green Valley, the trial court determined that the following question was appropriate to pose to the jury:

> [C]onsidering the evidence submitted and in this case did the parties agree that the [WCIDC] had a duty to reveal or disclose subsurface conditions to [Green Valley ?]

R.R. 2184a. However, following the parties' closing arguments and after the jury began deliberations, the jury sent a note to the judge stating, "We need to clarify the wording of did the parties agree. We are not sure what you mean. Would you please reword." R.R. 2211a. After discussion with counsel, the judge responded to the jury as follows: "In response to your note, you may consider question No. 1 as being reworded as follows: Considering the evidence submitted, did the [WCIDC] and the [Green Valley] have a common understanding that the [WCIDC] would have [a] duty of revealing subsurface conditions to the [Green Valley]." R.R. 2216a–2217a. The following morning, February 15, 2002, the jury returned its verdict, responding to special finding No. 1 in the affirmative, determining that the WCIDC breached its contractual duty to disclose subsurface conditions to Green Valley, and awarding damages in the amount of $603,500. A molded verdict was then entered against the WCIDC.

On February 25, 2002, the WCIDC filed its motion for post-trial relief arguing, by incorporation of its pre-trial motion in limine, that the trial court improperly admitted evidence of alleged oral agreements or understandings between the parties. On February 26, 2002, the trial court issued an order requesting that Green Val-

ley file an appendix with any brief filed in opposition to the WCIDC's motion including pages of the trial record that support the jury's answer to special finding No. 1. Thereafter, on May 17, 2002, the WCIDC submitted its brief in support of its motion for post-trial relief. On July 23, 2002, Green Valley submitted a brief in opposition to the motion, along with the requested appendix.

Ultimately, by Opinion and Order dated September 12, 2002, the trial court determined that it had improperly admitted the evidence supporting the jury's verdict and that, contrary to the trial court's denial of the WCIDC's motion in limine, the admission of such evidence should have been and was barred by the parol evidence rule. Further, the trial court determined that, even if not barred by the parol evidence rule, the evidence was insufficient to support the jury's verdict and, therefore, entered JNOV in favor of the WCIDC.[4] This appeal from the orders dated December 20, 2001 and September 12, 2002 followed.

On appeal, Green Valley raises two issues for our review: (1) whether the trial court erred in granting the WCIDC's motion for summary judgment as to Green Valley's negligence and fraud claims because the WCIDC is not entitled to governmental immunity under Section 8541 of the Tort Claims Act;[5] and (2) whether the trial court erred in retroactively excluding evidence of the parties' oral agreements and in entering JNOV in favor of the WCIDC on Green Valley's breach of contract claim.[6] We address these issues *seriatim.*

---

**4.** The trial court also concluded "that a new trial would be warranted but for the fact that the law supports the entry of judgment in favor of the [WCIDC]." Trial Court's Opinion dated September 12, 2002 at 12–13.

**5.** Our scope of review of a trial court's order granting summary judgment is limited to determining whether the trial court committed an error of law or an abuse of discretion. *Irish v. Lehigh County Housing Authority,* 751 A.2d 1201, 1203 n. 4 (Pa.Cmwlth.2000). Summary judgment is only appropriate when, after examining the record in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Pa. R.C.P. No. 1035.2; *E.O.J., Inc. v. Tax Claim Bureau of Schuylkill County,* 780 A.2d 814, 817 n. 2 (Pa.Cmwlth.2001).

**6.** Our review of a trial court's order granting a partys post trial motion for JNOV is limited to determining whether the trial court abused its discretion or committed legal error. *Mellon v. City of Pittsburgh Zoo,* 760 A.2d 921, 924 (Pa.Cmwlth.2000). Our Supreme Court has summarized the relevant considerations regarding the grant of JNOV as follows:

> It is axiomatic that, [t]here are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judg-

ment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations omitted). To uphold JNOV on the first basis, we must review the record and conclude that even with all the factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second [we] review the evidentiary record and [conclude] that the evidence was such that a verdict for the movant was beyond peradventure. *Id.*

> When we review a motion for JNOV, we must consider the evidence in the light most favorable to the verdict winner, who must receive the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. *Id.* (citing *Broxie v. Household Finance Co.,* 472 Pa. 373, 372 A.2d 741, 745 (1977)). Any doubts must be resolved in favor of the verdict winner, and JNOV should only be entered in a clear case. *Id.* Finally, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations. *Id.* (citing

GOVERNMENTAL IMMUNITY

Green Valley argues, first, that the trial court erred in concluding that the WCIDC is entitled to governmental immunity under Section 8541 of the Tort Claims Act because it does not fall within the statutory definition of "local agency" employed by our Supreme Court in *Sphere Drake*. It further contends that a close review of the relationship between the WCIDC and the County only bolsters this conclusion. We disagree.

In *Sphere Drake*, our Supreme Court reversed this Court's decision in *Modern Shoppers World–Mount Airy v. Philadelphia Gas Works*, 164 Pa.Cmwlth. 257, 643 A.2d 136 (1994) that the Tort Claims Act protected only traditional forms of government and that nonprofit corporations were not entitled to immunity. In determining whether the Philadelphia Facilities Management Corporation (PFMC) was a "local agency" under the Tort Claims Act, the *Sphere Drake Court* stated:

> Our inquiry begins with an examination of the plain language of the relevant statutory provisions.... The Tort Claims Act comprises Subchapter C of Chapter 85 of the Judicial Code, the chapter which addresses "Matters Affecting Government Units." The definition section of Chapter 85 defines a "local agency" as "[a] *government unit* other than the Commonwealth government." 42 Pa.C.S. § 8501. The general definitions section of the Judicial Code, which applies in the absence of further specific definitions, defines a "government unit" as, *inter alia,* "any *government agency* ...." *Id.* § 102. A "government agency," in turn, is defined by the Judicial Code as "[a]ny Commonwealth agency or any political subdivi-

Brown v. Shirks Motor Express, 393 Pa. 367, 143 A.2d 374, 379 (1958)).

sion or municipal or *other local authority,* or any officer or agency of any such political subdivision or local authority." *Id.* (emphasis supplied).

Although the Judicial Code does not define "local authority," the Statutory Construction Act does. It provides that the phrase "local authority," "[w]hen used in any statute finally enacted on or after January 1, 1975," means "a municipal authority or any other *body corporate and politic* created by one or more political subdivisions pursuant to statute." 1 Pa.C.S. § 1991. Both the Judicial Code and the Tort Claims Act were enacted after January 1, 1975; hence, both are subject to this overarching definition.

*Id.* at 545–546, 782 A.2d at 513 (emphasis added). Because the PFMC's Decree of Incorporation identified it as a "body politic and corporate" and because it was created by the City of Philadelphia, a political subdivision, pursuant to the Nonprofit Corporation Law, a statute, it satisfied the definition of "local authority." As such, it fell within the scope of the definition of "local agency" under the Tort Claims Act. The *Sphere Drake* Court further found that:

> [I]t is undisputed that PFMC exists solely to assist the City in meeting the needs of its citizens with respect to natural gas service. The City created PFMC, appoints its Board of Directors, and exercises substantial control over it. The assets of PFMC would vest in the City upon the dissolution of PFMC. PFMC employees participate in deferred compensation and defined benefit plans that are exclusively for City employees. As the *Modern Shoppers World* court itself recognized, PFMC's

Rohm Haas Co. v. Continental Casualty Co., 566 Pa. 464, 471–472, 781 A.2d 1172, 1176 (2001).

sole source of income is the management fee paid it by the City. That fact, combined with the fact that the City is obliged to indemnify PFMC's directors, officers and employees and hold them harmless from all claims and liability arising in connection with PFMC's management and operation of PGW, makes clear that any award of damages against PFMC is, in effect, an award against the City. In light of these facts, to hold that PFMC is not a local agency would be as contrary to the purpose of the Tort Claims Act as it is to the plain language of the Act. Accordingly, even if this Court needed to go beyond the plain language of the statute to decide this case, as Sphere Drake seems to believe, we would only be further convinced that PFMC is a local agency under the Act.
*Id.* at 550–551, 782 A.2d at 516 (internal citations omitted).

In sum, we must first determine whether the WCIDC meets the Statutory Construction Act's definition of "local authority." If it does, the WCIDC falls within the scope of "local agency" as defined in the Tort Claims Act. We may also, if necessary, go beyond this statutory scheme and look to the relationship between the WCIDC and the County, including the WCIDC's ties to the County purse.

As explained in *Sphere Drake*, under the Statutory Construction Act, "the phrase 'local authority,' '[w]hen used in any statute finally enacted on or after January 1, 1975,' means 'a municipal authority or any other *body corporate and politic* created by one or more political subdivisions pursuant to statute.'" *Sphere Drake*, 566 Pa. at 546, 782 A.2d at 513 (quoting Section 1991 of the Statutory Construction Act, 1 Pa.C.S. § 1991) (emphasis added). Here,

Green Valley asserts that the absence of the precise words "body corporate and politic" from the WCIDC's Articles of Incorporation means that it is not a "local agency" entitled to governmental immunity. Notably, however, we have rejected a *per se* rule that focuses on the fact of the entity's incorporation, to the exclusion of other factors, to determine whether that entity is a "local agency." *Burcik v. Caplen*, 805 A.2d 21, 26 (Pa.Cmwlth.2002).[7]

Further, an examination of these "other factors," leads to the conclusion that the WCIDC is a "local agency" entitled to governmental immunity. The history of the creation of the WCIDC is central to this analysis. The WCIDC's Articles of Incorporation state that it was created "[i]n compliance with the requirement of the Non-profit Corporation Law of Pennsylvania . . . pursuant to Resolution adopted by the County Commissioners . . . that a Corporation be established under the provisions of the aforementioned law. . . ." R.R. 863a. Accordingly, there is no question that the WCIDC is a "body corporate" and that it was created by a political subdivision pursuant to statute. As to whether it is a body "politic," it is clear that the WCIDC has a civic purpose, having been created by the County Board of Commissioners to promote economic development in the County and to create jobs for County residents. Accordingly, pursuant to *Sphere Drake*, we find that the WCIDC satisfies the definition of "local authority" under the Statutory Construction Act and, therefore, falls within the scope of the definition of "local agency" provided in the Tort Claims Act.

The control and operation of the WCIDC further confirms its status as a

---

7. Indeed, the trial court appropriately declared that it would "determine whether [the] WCIDC satisfies the definition of local authority without regard to the name ascribed to it by [the] WCIDC." Trial Court's Opinion dated December 20, 2001 at 4.

"local agency" under Section 8541 of the Tort Claims Act. Notably, the County maintains control over the WCIDC through its elected County Commissioners, who automatically serve as its Board of Directors. The Board members receive no compensation for their services and are automatically replaced by newly elected County Commissioners. All Board of Directors meetings are open to the public.

The WCIDC's day-to-day activities are inextricably intertwined with the County. The WCIDC conducts its business almost entirely within the geographic boundaries of the County, for the benefit of County residents. The County provides the office space utilized by the WCIDC in the County Courthouse, where the WCIDC maintains its registered corporate address. Further, the WCIDC's employees are treated comparably to other County employees, receiving the same compensation, raises, longevity benefits, vacation time, and sick days. The WCIDC is included in the County's telephone directory and appears on the County's web site as a County department.

The WCIDC and the County's Department of Planning and Economic Development have the ability to interchange personnel and share expertise pursuant to an agreement between the WCIDC and the County dated January 12, 1989. That agreement provides, in pertinent part:

> [T]he administrative and daily responsibilities of the WCIDC in carrying out its purpose are so extensive and are deemed to be imperative to the welfare of the County that the County desires to provide administrative services by the sharing of personnel with the WCIDC

so as to assist the WCIDC in carrying out its purpose.

R.R. 882a. In fact, the departments share the same executive director, Mr. Larese. The WCIDC also enters into cooperation agreements with the Redevelopment Authority through which the entities share personnel and the latter applies for grants for specific projects being undertaken by the WCIDC.

The WCIDC is also closely linked to the County's purse. Each October, the WCIDC submits a budget to the County for the following year, which includes a request for funds, and its budget is incorporated into the County's budget. The County finances the WCIDC's operations through grants, and is responsible for any funding deficits. The WCIDC's Notes to Financial Statements state:

> Because the [WCIDC] was created by the County ... for the delivery of services to County residents, the [WCIDC] has been evaluated under the aforementioned criteria for inclusion in the County reporting entity. This evaluation has concluded that the [WCIDC] is a component unit of the County, and therefore included in the County reporting entity.

R.R. 1401a. The Independent Auditors' Report prepared for the WCIDC for the year ended December 31, 2000 also specifically described the WCIDC as "a component unit of the County," and all of the WCIDC's financial statements are prepared in accordance with "generally accepted accounting principles as applicable to governmental units." R.R. 1393a, 1400a. Because it is a government nonprofit corporation, the WCIDC does not file an income tax return. Finally, the WCIDC is identified as an additional insured on the County's insurance policies,[8]

---

8. Green Valley refers to the fact that the WCIDC had its own errors and omissions and liability insurance policies as a basis for stripping it of its immune status. Green Valley's Brief at 32. However, we rejected a similar argument in *Mench v. Lower Saucon Town-*

and should the WCIDC's business fail, its assets would revert back to the County.

For all these reasons, we find that the WCIDC is a "local agency" entitled to governmental immunity under Section 8541 of the Tort Claims Act. 42 Pa.C.S. § 8541. As such, it was immune from Green Valley's claims of negligence and fraud.

## PAROL EVIDENCE

Next, Green Valley argues that even if the WCIDC is a "local agency" entitled to governmental immunity under Section 8541 of the Tort Claims Act, the trial court erred in entering JNOV in favor of the WCIDC because the evidence submitted in support of Green Valley's contract claim was properly admitted, should not have been retroactively excluded pursuant to the parol evidence rule, and was sufficient to support the jury's finding that the parties had a common understanding that the WCIDC had a duty to disclose the subsurface conditions of Lot 11. We agree.

### A.

 The parol evidence rule bars the admission of oral testimony which purports to explain or vary the terms of an integrated written agreement. *Lenzi v. Hahnemann University*, 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995). In the leading case applying the parol evidence rule in Pennsylvania, our Supreme Court explained:

> Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement. All preliminary negotiations, conversa-

tions and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence.

> The writing must be the entire contract between the parties if parol evidence is to be excluded, and to determine whether it is or not the writing will be looked at, and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing.

> *When does the oral agreement come within the field embraced by the written one?* This can be answered by comparing the two, and determining whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other if it were made. If they relate to the same subject-matter, and are so interrelated that both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing. This question must be determined by the court.

*Gianni v. R. Russell & Co.*, 281 Pa. 320, 323–324, 126 A. 791, 792 (1924) (internal citations and quotations omitted) (emphasis added). The task, then, is twofold: we must first determine whether the Option Agreement represents the entire agreement between the parties. If it does state

---

*ship,* 159 Pa.Cmwlth. 116, 632 A.2d 1011 (1993), wherein we held that a municipality's purchase of liability insurance exceeding the statutory cap on damages did not waive the protection of the Tort Claims Act.

the entire agreement, we must then determine whether an understanding of the subsurface conditions of Lot 11 was "within the field embraced" by the Option Agreement.

■ After a careful and critical review of the Option Agreement, we conclude that it does not represent the entire agreement between the parties regarding the sale of Lot 11. Notably, the Option Agreement does not contain an integration clause. The absence of such a clause serves as persuasive evidence that the parties did not intend the Option Agreement to serve as a complete and exclusive statement of the terms of their transaction. *See Sundlun v. Shoemaker,* 421 Pa.Super. 353, 617 A.2d 1330, 1334 (1992) ("[N]othing in the parties" written agreement supports the contention that it was intended as a complete and exclusive statement of the terms of the agreement. It did not contain an integration clause that would have made such an intention manifest.).

Additionally, throughout the course of the trial, testimonial and documentary evidence was presented indicating the parties' mutual understanding that Green Valley was on a "fast track" and needed "ready to go land" so that construction could "start as quickly as possible." R.R.1916a, 1995a–1996a, 2248a. However, nothing in the Option Agreement touches upon the subject matter of these representations or the parties' understanding in this regard.

Further, far from purporting to represent the entire agreement between the parties, the Option Agreement dictates consideration of extrinsic evidence by referencing an "Agreement of Sale" in Paragraph 12. R.R. 2297a. This reference to an Agreement of Sale demonstrates that the Option Agreement is not a complete and integrated contract that covered all aspects of the parties' transaction. Our Supreme Court has held that "[a] written instrument, referring to agreements or understandings not set forth therein, may be explained by parol. . . ." *C.D. Brown & Co. v. Standard Hide Co.,* 301 Pa. 543, 550, 152 A. 557, 559 (1930).

Finally, the Option Agreement was, by its very nature, designed to define the option period and the circumstances under which the option might be exercised; it was not intended to cover every aspect and condition of the sale, nor did it attempt to do so. The fact that the Option Agreement provided Green Valley with "the right to make test borings and soil analysis on the subject property," R.R. 2297a, is not dispositive. This right to conduct "due diligence" did not negate the various representations and/or promises made by the WCIDC regarding the condition of the land or its suitability for the purpose for which it was purchased.

Therefore, because we find that the Option Agreement does not represent the entire agreement between the parties regarding the sale of Lot 11, the parol evidence rule does not bar the extrinsic evidence offered by Green Valley in support of its breach of contract claim.[9]

### B.

■ Having concluded that parol evidence was properly admitted, we must now determine whether it was sufficient to support the jury's finding that the parties had

---

9. Because we find that the Option Agreement is not a complete and integrated contract, we need not reach the second part of the analysis; that is, whether the parties would have "naturally and normally" included representations and promises concerning the subsurface conditions of Lot 11 in the Option Agreement.

Further, because we have concluded that the evidence was properly admitted, a new trial is not warranted.

a common understanding that the WCIDC had a duty to disclose the subsurface conditions of Lot 11. For the reasons that follow, we find that it was.

In its brief and appendix in opposition to the WCIDC's motion for post-trial relief, Green Valley cited, at the trial court's request, all of the evidence that it believed supported the jury's answer to special finding No. 1. *See* R.R. 1644a–1823a. This included evidence that the parties' contract provided for land that was "ready to build upon," "ready-to-go," "ready to roll," and "where construction could begin by September 1, 1997 on a 'fast track,'" R.R. 1650a (emphasis omitted); that the WCIDC knew in 1997 that Lot 11 contained coal and had been deep mined, and that "the WCIDC both agreed to and undertook the duty to disclose its knowledge of the deep mines under [Lot 11] when Mr. Rosenblatt himself specifically requested all information on coal activity or mine subsistence in connection with the property and the WCIDC then failed to disclose its own knowledge (while at the same time providing a DER report and other partial data)," R.R. 1652a (emphasis omitted); that the WCIDC promised Mr. Rosenblatt that he would receive "good," "fully-developed" land, on a "quality" site, R.R. 1654a; and that, generally, when a seller, at the request of the buyer, provides copies to the buyer of all reports concerning the subsurface conditions of a property, a reasonable person could be led to understand that the seller has agreed to disclose its knowledge of subsurface conditions. R.R. 1656a–1658a.

The trial court concluded that this evidence was "insufficient to create a contract implied-in-fact that would impose upon [the WCIDC] the duty to disclose subsurface conditions of the property." Trial Court's Opinion dated September 12, 2002 at 8. Specifically, it found that the primary evidence relied upon by Green Valley involved "alleged representations made by [the WCIDC], describing the property as 'fully-developed,' 'ready to go,' 'quality property' and 'ready to build upon,' as well as [Green Valley's] request for three and one-half 'good' acres." *Id.* at 9, 152 A. 557. According to the trial court, "no reasonable person in the position of the parties would be led to understand that the use of this language created a contractual agreement for [the WCIDC's] disclosure of subsurface information." *Id.* We disagree.

■ A contract implied-in-fact "is an actual contract which arises when parties agree upon the obligation to be incurred, but their intention is not expressed in words and is, instead, inferred from their actions in light of the surrounding circumstances." *Department of Environmental Resources v. Winn,* 142 Pa.Cmwlth. 375, 597 A.2d 281, 284 n. 3 (1991) (citing *Central Storage & Transfer Co. v. Kaplan,* 37 Pa.Cmwlth. 105, 389 A.2d 711 (1978)). Based upon the parties' actions in light of the surrounding circumstances, the jury could have reasonably concluded that the parties had a common understanding that the WCIDC had a duty to deliver a ready to build lot or to disclose the subsurface conditions of Lot 11 to Green Valley for its own determination of whether the voids on Lot 11 rendered it *not* ready for building.

Although the trial court found that "mere adjectives are insufficient to create a contractual duty," Trial Court's Opinion dated September 12, 2002 at 9, such "adjectives" are the vehicles by which individuals express their understandings. It is the duty of the jury, not this Court, to determine the parties' understanding of the meaning of such "adjectives" in the context of the discussions and the transaction in which they were used. Certainly, an understanding between the parties that land is "ready to go" and can be built upon

by a specified date, when considered in light of or in conjunction with a promise by the seller that the land is "quality," "good" and "fully-developed," could lead a reasonable person to conclude that the seller was contractually obligated to deliver a lot that required no preparation beyond actual construction. Instead, the WCIDC delivered a lot that promptly swallowed a bulldozer. Months of excavation and reclamation were required before Green Valley could even begin construction on its new plant. The common understanding of the parties was that Green Valley would occupy its new facility on January 1, 1998; however, in March of 1998, the land was still being reclaimed. The WCIDC not only breached its contractual obligation to Green Valley, it did so knowingly.

Given the facts and the law set forth above, and drawing all factual inferences in favor of Green Valley, there can be little doubt that the jury could have reasonably concluded that the parties had a common understanding that the WCIDC had a duty to disclose what it knew regarding the subsurface conditions of Lot 11 or stand behind its contractual promise to deliver a ready to build lot. It fulfilled neither duty.

For these reasons, we conclude that the trial court erred in entering JNOV in favor of the WCIDC on Green Valley's breach of contract claim. The jury's verdict should stand.

## CONCLUSION

We hold that the trial court did not err in granting the WCIDC's motion for summary judgment as to Counts I (negligence) and III (fraud) of Green Valley's amended complaint. However, we hold that the trial court did err in entering judgment notwithstanding the verdict in favor of the WCIDC on Green Valley's breach of contract claim.

Judge McGINLEY did not participate in the decision in this case.

## ORDER

AND NOW, this 4th day of September, 2003, the order of the Court of Common Pleas of Westmoreland County dated December 20, 2001, granting Appellee's Motion for Summary Judgment as to Counts I & III of the Amended Complaint is hereby affirmed and the order of the Court of Common Pleas of Westmoreland County dated September 12, 2002, granting judgment notwithstanding the verdict in favor of Appellee is hereby reversed.