**Mar-Paul Co. v. Jim Thorpe Area School District**

*Sam L. Warshawer Jr.,* for plaintiff.

*Brian E. Subers,* for defendant Jim Thorpe Area School District.

*Raymond P. Wendolowski,* for defendant Popple Construction.

NANOVIC, *P.J.,* July 31, 2008—

## I. PROCEDURAL AND FACTUAL BACKGROUND

In 2002 and 2003, the Jim Thorpe Area School District built a new kindergarten through eighth grade elemen-

tary school in Kidder Township, Carbon County, Pennsylvania (project). The general contractor for the project was Mar-Paul Company Inc. The subcontractor for the site work was Popple Construction Inc. Collectively, Mar-Paul and Popple are hereinafter referred to as the "contractors."

In accordance with the Public School Code of 1949, the project was subject to competitive bidding. 24 P.S. §7-751(a). Mar-Paul's bid for general construction was submitted to the district on October 30, 2001. On November 19, 2001, the district passed a motion to award the general construction contract to Mar-Paul subject to certain conditions. Under the terms of the bid documents, as well as the contract subsequently signed by the parties, the project contained a fixed and firm completion date of August 1, 2003.

A written agreement between the district, as project owner, and Mar-Paul, as general contractor, was entered on February 4, 2002 (contract).[1] On this same date, the

---

1. The three-month delay which occurred between the bid opening and signing the contract was caused by bidding problems associated with two other contracts for the project, those for HVAC and plumbing work. Although Mar-Paul and Popple complain that this delay further shortened the construction period for the August 1, 2003 deadline, this delay was foreseeable. By statute, public work contracts must be awarded within 60 days of the date of the bid opening and executed within 60 days of the date that the contract is awarded. 62 Pa.C.S. §§3911(a) and 3912; cf. *NVC Computer Sales Inc. v. City of Philadelphia*, 695 A.2d 933, 936 (Pa. Commw. 1997), *appeal denied*, 550 Pa. 711, 705 A.2d 1312 (1997) ("Where a municipal body advertises for bids for public work and receives an apparently satisfactory bid, it is within the contemplation of both the bidder and acceptor that no contractual relation arises until a written contract has been entered into embodying all material terms of the offer and acceptance." (quoting *Crouse Inc. v. Braddock Borough School District*, 341 Pa. 497, 19 A.2d 843 (1941))).

district issued its notice to proceed which, pursuant to the contract, obligated Mar-Paul to commence work within 10 days. Section 01120, summary of work, ¶1.07 (A). Popple's proposal for the site work was submitted to Mar-Paul on October 30, 2001; the subcontract between Mar-Paul and Popple was entered on January 10, 2002.

In accordance with its subcontract with Popple, Mar-Paul directed Popple to immediately begin site work for the project. By March 13, 2002, Popple was reporting that excessive moisture levels in the subgrade soil prevented compaction as required by the contract specifications. By letter dated March 21, 2002, Mar-Paul formally notified the district's architect, Hayes Large Architects, of the moist soil conditions and that it was "prevented from proceeding as planned" and needed direction on how to proceed.[2] These same issues were previously discussed at a job site conference held on March 18, 2002, with representatives present from the district, Mar-Paul, Popple, the architect, and United Inspections Services, a geotechnical engineer acting as the district's consultant.

In answer to the high moisture content of the soil, United recommended that both planned access roads and

---

2. Under the contract, the architect acted as both the district's architect and representative with authority to act on the district's behalf. The contract provides:

"Select fill: Due to the actual soil conditions which may prevail on the site, it may be necessary to select the sequence and manner in which fill material is spread and compacted. The contractor shall not proceed with such operations without first making satisfactory arrangements with, and receiving the written approval of, the architect." Section 02220, Excavating, filling and grading, ¶3.03(D).

the building pad area be undercut by removing 18 to 24 inches of soil, and that geogrid and stone be used for stabilization before further backfilling. See United "Site Recommendation report" dated March 22, 2002.[3] This recommendation was followed by Popple's proposal on March 25, 2002, to perform the overexcavation,[4] stone, and geogrid work at a cost ranging between $114,174.86 to $191,910.76, depending upon the depth of subgrade soil removed. Mar-Paul forwarded Popple's proposal to the district's architect by letter dated March 29, 2002.

The architect disagreed with the contractors' request for additional compensation to address the wet soil conditions. Rather than approving United's recommendation

---

3. The recommendation made by United would have required Popple to overexcavate to a depth below the specified cut elevations in the contract specifications and drawings. Because this work would be outside the scope of the work bid, it involved "additional work" for which Popple would be entitled to additional compensation. See *PennDOT v. Gramar Construction Co.,* 71 Pa. Commw. 481, 485, 454 A.2d 1205, 1207 (1983) ("The law is clear that a contractor who performs work beyond the scope of its contract is entitled to additional compensation."); see also, *Thomas M. Durkin & Sons Inc. v. PennDOT,* 742 A.2d 233, 238-39 (Pa. Commw. 1999) (holding that additional rock which was required to be removed beyond that "precisely" designated in the design plans represented work outside the scope of the contract and entitled the contractor to additional compensation). This fact, the contractors contend, is significant because it explains why the district's architect would not approve United's recommendation for overexcavation, even though this would have provided an immediate solution to the moisture issue, and instead insisted that the existing soil be disked and air-dried, thereby contributing to the delay for which the contractors seek compensation.

4. "Overexcavation" is commonly used and understood in the earthmoving and excavation industry to apply to the removal of unsuitable soils below subgrade and the replacement of same with suitable, compacted material.

to remove and replace unsuitable soils, or suggesting another option, by its letter of April 4, 2002, the architect responded:

"I am directing your firm to proceed with the work as described in the contract documents (refer to General conditions, par. 4.3.3).[5] All work shall be done to meet the intent of the contract documents."

This letter further stated that if the specified compaction results could not be met, then Mar-Paul was to notify United and the architect, at which time, United would "provide the necessary recommendations as required for you to achieve the results as shown and noted on the project drawings and specifications."

Subsequently, United was again asked to examine the issue and suggest solutions. In its letter dated April 9, 2002, United suggested two options: Option "A" recommended removal and replacement of soils; Option "B" recommended that the existing site soils be scarified and windrowed—*i.e.,* disked and air-dried—until the moisture content was reduced to optimum levels. On April 10, 2002, the architect directed that Option "B" be employed. Popple was advised of the architect's decision by April 11, 2002, and began disking and loosening the soil, exposing it to the air. Field tests performed on April 17, 2002, showed the soil was still unacceptable.

---

5. This provision states:

"Continuing contract performance. Pending final resolution of a claim except as otherwise agreed in writing or as provided in subparagraph 9.7.1 and article 14, the contractor shall proceed diligently with performance of the contract and the owner shall continue to make payments in accordance with the contract documents." General conditions, Administration of the contract, ¶4.3.3.

On April 17, 2002, the district's clerk of the works recommended the district employ a new geotechnical engineer, CMT Laboratories Inc., to replace United. This recommendation was approved by the district on the same date. In its report issued on April 24, 2002, CMT stated that while United's recommendation of overexcavation and placement of stone and geogrid "would allow for the *immediate* continuation of site preparation activities" (emphasis added), continued air-drying of the existing soil should also allow the contractor to achieve the required compaction. No time period was projected for the second alternative.[6]

On April 29, 2002, the district's architect again directed Mar-Paul to continue air-drying the soil. As a result, scarifying and windrowing operations continued. On May 6, 2002, CMT reported the first successful compaction test result with respect to Building Pad A. Additional sections were successfully tested between May 6 and May 20, 2002. In the meantime, the site preparation which Popple was to perform was delayed by more than two months, from March 13 to May 20, 2002.

------

6. CMT also noted in its report that precautions normally taken to avoid or stabilize wet soil conditions had not been implemented. Previously, United had reported that the site was damaged by clearing and grubbing operations, and that truck traffic was too heavy for the wet soil conditions that existed at the time. The district contends these problems were caused by Popple and that they delayed the project. The district further contends that additional delay was caused because Popple did not appropriately and aggressively perform the scarifying and windrowing operations. Popple claims that the clearing and grubbing work it performed was conducted in accordance with industry standards, as was the means and methods it employed to air-dry the soil, which had been used by it on numerous prior occasions.

Popple claims it is owed $33,809 for the work it performed due to the wet soil conditions: air-drying the subsoil, overexcavation, and stone placement.[7] Popple also claims that during the time the district was deciding how to proceed, its equipment at the site stood idle. For this downtime, from March 23 through May 20, 2002, Popple claims it is owed $187,810.[8] In addition to these two claims, both connected to the underlying soil conditions at the project site, Popple claims it is owed $12,696 for the time its equipment stood idle during the six-day period from October 22, 2003, through October 28, 2003, as part of its costs for remobilization and demobilization. All of Popple's figures for idle equipment are derived from rental values appearing in the Blue Book, rather than actual costs.[9]

The total amount Popple claims for additional costs and for delay damages which it attributes to unforeseen wet soil conditions is $221,619. Mar-Paul seeks to recover $136,517 in increased costs for supervision, soil testing, extra heating, and other expenses it incurred because of these same conditions.

---

7. This updated figure was first submitted to Mar-Paul by Popple on August 21, 2002. Previously, on May 2, 2002, Popple had advised Mar-Paul that its costs for overexcavation and stone replacement for Building Pad A were $35,312.12.

8. This figure was also provided to Mar-Paul by Popple on August 21, 2002. Previously, on April 30, 2002, Popple had forwarded correspondence to Mar-Paul enclosing costs for idle equipment derived from the "Rental Rate Blue Book" and indicating that daily costs would apply until Popple's equipment was "up and running again."

9. All of the equipment which Popple had located at the project site during the relevant time period was owned by it, rather than leased. With respect to this equipment, the documentation Popple produced in response to discovery showed that the total actual equipment costs it incurred during the alleged period of delay was $8,319.19.

Before us is the district's motion for partial summary judgment as to Counts I through IV of Mar-Paul's complaint for additional work and delay damages claimed as a result of the wet soil conditions. Counts I and II of the complaint are direct claims by Mar-Paul for breach of contract and breach of the duty of good faith and fair dealing respectively, each in the amount of $136,516. Counts III and IV assert claims by Mar-Paul on behalf of Popple on the same legal basis as those asserted in Counts I and II, each in the amount of $221,619, in which Mar-Paul seeks to be indemnified under the "pass through" provisions of the Mar-Paul/Popple subcontract for Popple's claims attributable to the wet soil conditions. Under the subcontract between Popple and Mar-Paul, Popple is only entitled to recover additional compensation from Mar-Paul if Mar-Paul is able to "pass through" this expense for payment by the district.[10]

_____

10. Mar-Paul cites *PennDOT v. Brayman Construction Corporation-Bracken Construction Company, Joint Venture,* 99 Pa. Commw. 373, 513 A.2d 562 (1986) as authority to bring these claims on behalf of Popple. See Mar-Paul's brief in opposition to the school district's motion for partial summary judgment, p. 42. *Brayman,* however, does not support this position. To the contrary, after a brief discussion of *Severin v. United States,* 99 Ct.Cl. 435 (1943), *cert. denied,* 332 U.S. 733 (1944), which held that a general contractor cannot recover on behalf of its subcontractor against the owner of a construction project unless it has directly suffered damages or bears liability to the subcontractor as a result of the owner's alleged breach, the *Brayman* court stated: "This doctrine [referring to *Severin*] has not been adopted in Pennsylvania . . . ." 99 Pa. Commw. at 377, 513 A.2d at 564. Whether Mar-Paul has standing to bring these claims appears, at this time, to be an open question. Because it would be inappropriate for us to sua sponte raise and rule on an issue which does not involve subject matter jurisdiction, we will discuss it no further. See *e.g., School Security Services Inc. v. Duquesne City School District,* 851 A.2d 1007, 1011 (Pa. Commw. 2004); see also, *Hertzberg v. Zoning Board of Adjustment of the City*

The district also moves for partial summary judgment against Popple on Counts I, II, and VI through IX of Popple's new matter counterclaim. Counts I, II, VII and VIII of this counterclaim repeat the claims raised in Counts III and IV of Mar-Paul's complaint, with Count VII being couched in terms of a contract implied-in-law and fact, and Count VIII being characterized as one for quantum meruit. Counts VI and IX set forth claims under the Pennsylvania Contracts for Public Works Act, 62 Pa.C.S. §§3901-3942.

Also before us is Mar-Paul's motion for partial summary judgment against Popple regarding Count IV of Popple's counterclaim. In this counterclaim, Popple seeks a declaratory judgment against Mar-Paul.

Upon consideration of the parties' submissions, argument thereon, and for the reasons set forth herein, we grant in part and deny in part the district's motion for partial summary judgment, and deny Mar-Paul's motion for partial summary judgment.[11]

---

*of Pittsburgh,* 554 Pa. 249, 255 n.6, 721 A.2d 43, 46 n.6 (1998) ("whether a party has standing to maintain an action is not a jurisdictional question").

The "pass through" provision in the Mar-Paul/Popple subcontract provides as follows:

"Delays. . . . Subcontractor agrees that it shall not be entitled to nor claim any cost reimbursement, compensation or damages for any delay, obstruction, hindrance or interference to the work except to the extent that contractor is entitled to corresponding cost reimbursement, compensation or damages from owner under the principal contract for such delay, obstruction, hindrance or interference, and then only to the extent of the amount, if any, which contractor, on behalf of subcontractor, actually receives from owner on account of such delay, obstruction, hindrance or interference." Subcontract, ¶17.

11. The standard for granting a motion for summary judgment is set forth in Pa.R.C.P. 1035.2. Essentially, "[a] proper grant of sum-

## II. DISCUSSION

### A. *Mar-Paul's Claims on Its Own Behalf and on Behalf of Popple Arising From Unexpected Soil Conditions*

The first issue we address is which party bears the risk of additional work due to unforeseen subsurface conditions in a construction contract: the owner or the contractor. Ordinarily, contractual obligations are absolute, unless the contract provides otherwise. As a general rule, "a contractor is presumed, in the absence of an express provision to the contrary, to have assumed the risk of unforeseen contingencies arising during the course of the work, unless performance is rendered impossible by an act of God, the law, or the other party." *O'Neill Construction Company Inc. v. City of Philadelphia,* 335 Pa. 359, 361, 6 A.2d 525, 526-27 (1939); see also, *Commonwealth, Department of General Services v. Osage Company Inc.,* 24 Pa. Commw. 276, 281-82, 355 A.2d 845, 848 (1976).

In the present case, the contract provides in relevant part:

"Claims for concealed or unknown conditions. If conditions are encountered at the site which are (1) subsur-

---

mary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a prima facie cause of action or defense." *Noel v. First Financial Bank,* 855 A.2d 90, 92 (Pa. Super. 2004). The court is not to decide issues of fact, but rather determine whether there exist genuine issues of material fact to be tried. "Summary judgment is proper only when the facts are so clear that reasonable minds cannot differ." *Limbach Company LLC v. City of Philadelphia,* 905 A.2d 567, 573 (Pa. Commw. 2006).

face or otherwise concealed physical conditions which differ materially from those indicated in the contract documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the contract documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the contractor's cost of, or time required for, performance of any part of the work, will recommend an equitable adjustment in the contract sum or contract time, or both. If the architect determines that the conditions at the site are not materially different from those indicated in the contract documents and that no change in the terms of the contract is justified, the architect shall so notify the owner and contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the architect has given notice of the decision. If the conditions encountered are materially different, the contract sum and contract time shall be equitably adjusted, but if the owner and contractor cannot agree on an adjustment in the contract sum or contract time, the adjustment shall be referred to the architect for initial determination, subject to further proceedings pursuant to paragraph 4.4." General conditions, Administration of the contract, ¶4.3.4.

Neither of the two qualifying conditions described in this provision have been established: the contractors have

not pointed to any material discrepancies between the soil conditions represented to exist in the contract documents and those actually existing, nor have they proven that the soil conditions at the site differ materially from those ordinarily found to exist and which are generally recognized as inherent in construction activities of the type provided for in the contract documents. Instead, the contractors argue that the district, due to constructive fraud and interference with the contract, assumed the risk of subsurface conditions. For the reasons which follow, each of these issues presents questions of fact which preclude summary judgment.

Both arguments center on the existence and availability to prospective bidders of a project narrative, dated April 27, 2000, prepared on behalf of the district by Rettew Associates Inc. (a consultant to the architect) in conjunction with an erosion and sedimentation plan for the project site. These two documents complement one another. As is relevant to this discussion, the plan delineates and identifies the types of soil throughout the project site and the narrative describes the characteristics of each soil type. The predominant soil type depicted on the plan is in the AsA category, known as "Alvira and Shelmadine Silt Loam." As to this soil type, the narrative states it is unsuitable for winter grading and further warns: "Site grading on AsA soil shall not be performed during the winter time."

The parties appear to all agree that none of the bidders received a copy of this narrative as part of the bid package. Whether any of the bidders requested a copy and, if so, whether a copy was made available, is in dispute. The contract documents state:

"A copy of the Sedimentation and Erosion Control plan and project narrative shall be kept available for inspection on the construction site at all times through the term of the project.

"(1) Contractor shall request a copy of the project narrative from the architect. The contractor's copy, once reviewed, shall be available in the contractor's field office." Section 02215, Sedimentation and erosion control, ¶1.03(D).

The contractors argue that under the plain language of this provision, the narrative was only made available to contractors (*i.e.,* successful bidders), and not to those bidding during the bidding process. Additionally, the district's architect, when questioned about the availability of the project narrative, testified as follows:

"Q. And which geotechnical report was available for the general contractor's review?

"A. United Inspection's geotech report.

"Q. It wasn't the Rettew report that we had looked at earlier?

"A. The Rettew report would have been a part of the E&S control. *That would not be part of it.* It would have been the United Inspection's geotech report.

"Q. *So it was Popple exhibit 2 that was available for them to review, not Popple exhibit 3?*

"A. *To the best of my knowledge, that is correct.*" Harris deposition, 7/27/2006, 228:19-229:11. (emphasis added)

United was employed by the district to take soil borings at the project site. The employment of United and

the results of its testings were disclosed and made available to bidders. The contract documents provided:

"3.5.2 Subsurface drilling was performed on the site by *United Inspection Services*. Prepared forms containing information secured by these borings are available at the architect's office upon receipt of signed release form and payment of a $25 fee. The release form, to be used by bidders requesting subsurface drilling information, has been provided in the appendix to volume 1. Bidders are instructed to copy the release form in the project manual to submit their request. Where borings, test pits, test piles, and existing underground and overhead structure locations are shown, they are for the information of the owner only; their correctness is not guaranteed by the owner or the architect, and in no event is this information to be considered a part of the contract, or to be used for computations in submitting a proposal. If this information is used by a bidder in preparing its proposal, it must assume all risks resulting from conditions differing from the approximation shown." Section 00210, Supplementary instructions to bidders, ¶3.5.2.

United's report of its testings was prepared in 1997, four years before the bids were opened. It contains general assurances that the site soil is "suitable for construction" and also states:

"(1) 'Ground water was not encountered within the soil borings at the time of soil investigation' (p. 6);

"(2) 'Based on the field and laboratory investigations, the site is suitable for the proposed construction using shallow spread footings' (p. 7); and

"(3) 'Soil at the site is suitable for use as a structural fill material' (p. 7)."[12]

The contractors claim that when the district withheld the narrative, yet made assurances to the contrary in the United report, its conduct was intended to mislead and deceive as to the suitability of the project site for grading during the winter months. As argued by the contractors, the information contained in United's report, when read in light of the narrative, was incomplete and, at least as to the winter grading, misleading. Cf. *Department of General Services v. Pittsburgh Building Company,* 920 A.2d 973, 986 (Pa. Commw. 2007), *appeal denied,* 595 Pa. 712, 939 A.2d 890 (2007).

### 1) Constructive Fraud

In *Acchione and Canuso Inc. v. PennDOT,* the Pennsylvania Supreme Court set forth a five-part test for determining whether constructive fraud has occurred which will supersede a contract's exculpatory provisions and entitle an aggrieved contractor to recover additional costs and damages:

---

12. The contractors have presented no evidence that United's subsurface drilling report was inaccurate either as to the location of the borings or the results obtained. Therefore, this report by itself would not support a claim of fraud. Cf. *O'Neill Construction Co. v. City of Philadelphia,* 335 Pa. 359, 366-67, 6 A.2d 525, 529 (1939). In fairness, the report also notes that ground water levels can be expected to fluctuate throughout the year (p. 6), that moisture density tests of all soils need to be conducted to determine the maximum dry density and optimum moisture content (p. 8), and that variations of water levels can be anticipated. (Appendix A, General notices, p. 2.)

"(1) Whether a positive representation of specifications or conditions relative to the work is made by the governmental agency letting the contract or its engineer.

"(2) Whether this representation goes to a material specification in the contract.

"(3) Whether the contractor, either by time or cost constraints, has no reasonable means of making an independent investigation of the conditions or representations.

"(4) Whether these representations later prove to be false and/or misleading either due to actual misrepresentation on the part of the agency or its engineer or, by what amounts to a misrepresentation through either gross mistake or arbitrary action on the part of the agency or its engineer.

"(5) Whether, as a result of this misrepresentation, the contractor suffers financial harm due to his reliance on the misrepresentation in the bidding and performance of the contract." 501 Pa. 337, 343-44, 461 A.2d 765, 768 (1983). (emphasis removed)

Under this test, the misrepresentation must have been intentionally or negligently made; a "mere inaccuracy or innocent mistake" is insufficient. *Pennsylvania Turnpike Commission v. Smith,* 350 Pa. 355, 362, 39 A.2d 139, 142 (1944), *overruled on other grounds by Spector v. Commonwealth,* 462 Pa. 474, 341 A.2d 481 (1975). The representation must also be positive in nature and either (1) so precise and definite in its assertion that the claimant is clearly entitled to accept and rely upon it without further investigation as part of the basis on which the contract is entered, or (2) one in which the circumstances establish the contracting agency knew, or should

have known, the claimant had no reasonable means of conducting an independent investigation of the facts asserted, either because of time or cost restraints, and was bound to rely upon the representation. See *id.* at 362-63, 39 A.2d at 142 (discussing several relevant, authoritative cases);[13] see also, *Acchione,* 501 Pa. at 344, 461 A.2d at 768-69 (independent testing to verify accuracy of PennDOT's representation impractical due to size of project and impracticality of testing, as well as superior knowledge of PennDOT); *PennDOT v. P. DiMarco and Company Inc.,* 711 A.2d 1088, 1091 (Pa. Commw. 1998) ("If the investigation purportedly required by the contract could not reasonably have been performed, those [bidder representation] provisions cannot be used to deny recovery to the contractor.").

---

13. In *Branna Construction Corp. v. West Allegheny Joint School Authority,* 430 Pa. 214, 219, 242 A.2d 244, 246 (1968), the Pennsylvania Supreme Court explained:

"[T]he decision in *Smith* was predicated upon several factors . . . : (1) that the contractor was compelled to rely upon the plans as to the subsurface conditions since it was virtually impossible to make a thorough and independent investigation of the conditions in the short time allotted between the receipt of the plans and the time for bidding; (2) the Turnpike Commission had knowledge that the subsurface was predominantly rock and not soft loose earth as represented by the plans, and (3) the misrepresentations actually worked a constructive fraud upon the contractor."

Moreover, in *Central Penn Industries Inc. v. PennDOT,* 25 Pa. Commw. 25, 30, 358 A.2d 445, 448 (1976), the court stated that "insufficiency of the time allowed for investigation by bidders, standing alone, will not support a claim for extra compensation for unanticipated subsoil conditions." It must also be shown that "the information conveyed by the government agency was false or misleading, whether it was mistakenly so or due to arbitrary action or intentional subterfuge." *A.G. Cullen Construction Inc. v. State System of Higher Education,* 898 A.2d 1145, 1170 (Pa. Commw. 2006).

When constructive fraud exists, the exculpatory clauses of the contract no longer shield the agency letting the contract from liability and the risk of unexpected subsurface conditions shifts to the government agency. See *Pittsburgh Bldg. Co.,* 920 A.2d at 985; cf. *Branna Construction Corp. v. West Allegheny Joint School Authority,* 430 Pa. 214, 217-18, 242 A.2d 244, 246-48 (1968) (holding that information about subsurface conditions provided by a government authority which is later determined to be inaccurate will not alone support a claim of constructive fraud provided the agency lacked any prior knowledge of the unanticipated subsurface conditions; under such circumstances, the exculpatory provisions of the contract apply and will be enforced).[14] To hold otherwise would allow a party who secures a contract by fraud to deprive the other of relief, a consequence inimical to the law and unenforceable. Cf. *Smith,* 350 Pa. at 363, 39 A.2d at 143.[15]

---

14. In *Branna Construction Corp.,* as here, a number of exculpatory provisions in the contract placed the risk of unforeseen subsurface conditions on the contractor:

"(1) no responsibility is assumed by the owner or architect for subsurface conditions; (2) the information concerning these conditions was obtained by the owner for its own use in designing the project; (3) bidders shall make their own investigation of existing subsurface conditions; (4) the project was to be completed on an 'unclassified' basis which in construction business parlance means that anything discovered by the contractor after the execution of the contract will be at the sole risk and responsibility of the contractor; (5) such information is given to the contractor for guidance only; and (6) the contractor will be held responsible for carrying out and completing all excavation work regardless of the formations encountered." 430 Pa. at 220, 242 A.2d at 247.

15. Notwithstanding our denial of the district's motion, Mar-Paul's claim of constructive fraud, when examined against the *Acchione* factors, appears tenuous. Cf. *Acchione and Canuso Inc. v. PennDOT,* 501

## 2) Interference With Contract

"The doctrine of active interference prohibits a party from raising exculpatory provisions of a contract as a defense if: (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there

---

Pa. 337, 343-44, 461 A.2d 765, 768 (1983). Its claim hinges on the contents of United's report and its reliance on those contents.

To begin, Mar-Paul has failed to point to any inaccuracies in the United report. See *supra* n.12. This report appears to be balanced and, on its face, is qualified. While the court in *Pittsburgh Bldg. Co.,* held that an affirmative misrepresentation is not required for constructive fraud to exist—that a representation which is misleading in light of other information known and withheld by the government agency is sufficient—whether the representation is false or misleading is a separate question from whether there has been a positive representation which the contractor has a right to rely upon. See *Department of General Services v. Pittsburgh Bldg. Co.,* 920 A.2d 973, 986 (Pa. Commw. 2007), *appeal denied,* 595 Pa. 712, 939 A.2d 890 (2007). *Acchione,* as well as the Supreme Court precedents on which it is based, requires that a positive misrepresentation be made to support a claim of constructive fraud. 501 Pa. at 344, 461 A.2d at 768. Whether the United report—given the technical nature of some of the information which it contains and which requires experience or training in this field to fully understand, as well as the qualifications which have been made in the report to such information—presents misleading or factually inaccurate information is a close factual question more appropriately resolved after the record has been fully developed. There is also a serious question whether the United report was ever received or, in fact, relied upon by the contractors. Mar-Paul's brief in opposition to school district's motion for partial summary judgment, pp. 8-9, 27. Absent such reliance, there can be no fraud.

The third element in the *Acchione* test examines whether the contractor had any reasonable means of making an independent investigation of the conditions or representations which later proved to be false or misleading. 501 Pa. at 344, 461 A.2d at 768. Neither Mar-Paul nor Popple appear to have requested or obtained a copy of United's report, nor to have requested or attempted to obtain a copy of the narrative. It is therefore uncertain whether a copy of the narrative would have been

is a failure on the part of the owner to act in some essential manner necessary to the prosecution of the work." *Pittsburgh Bldg. Co.,* 920 A.2d at 987. (quotation marks omitted) "[W]here an owner by an unwarranted positive

---

provided if requested. Even if the request had been refused, there is still a question whether such information was not contained in public documents and therefore readily available to the contractors. In this respect, it must be remembered that the erosion and sedimentation plan was available to bidders; it was only the narrative which the contractors contend was withheld. However, the narrative's description of the characteristics of each soil type depicted on the plan was not based on specific soil tests or samples taken from the project site, but on the general geological characteristics of each soil type involved. Although the district contends that this information was available to Mar-Paul and Popple in public documents, there is nothing in the record to substantiate this contention. Nor would it be appropriate for us to take judicial notice of such fact as requested by the district.

If the United report is not considered, by default, Mar-Paul has only the withholding of the narrative to support its claim of fraud. Standing alone, and absent any representations to the contrary, there appears to be no separate and affirmative duty on a government agency to disclose to prospective bidders adverse subsurface conditions of which it is aware. See *O'Neill Construction Co.,* 335 Pa. at 368, 6 A.2d at 529. This contrasts with such a duty when the condition is a dangerous one of which the owner has knowledge. See *Quashnock v. Frost,* 299 Pa. Super. 9, 18 n.4, 445 A.2d 121, 126 n.4 (1982) (holding that the seller of a termite-infested home, which is not discoverable upon a reasonable examination of the property, has an affirmative duty to disclose this condition, if he is aware of it, to an unsuspecting buyer, notwithstanding that the buyer made no inquiry about termites or defects in the home). Moreover, the duty of good faith and fair dealing implied in a contract arises only once the contract exists, not before. See *Pennsylvania Chiropractic Association v. Independence Blue Cross,* 2001 WL 1807781, *5 (Pa.Com.Pl. 2001) (citing *Creeger Brick and Building Supply v. Mid-State Bank and Trust Co.,* 385 Pa. Super. 30, 35, 560 A.2d 151, 153 (1989)). Consequently, even if Mar-Paul is able to show that the district withheld or failed to disclose the narrative, this by itself, in the context of the exculpatory provisions of the contract, is insufficient to sustain a cause of action for fraud.

act interferes with the execution of a contract, or where the owner unreasonably neglects to perform an essential element of the work in furtherance thereof, to the detriment of the contractor, [the owner] will be liable for damages resulting therefrom." *Henry Shenk Co. v. Erie County,* 319 Pa. 100, 106, 178 A. 662, 665 (1935).

In *Pittsburgh Bldg. Co.,* the court held that the Department of General Services' failure to disclose the contents of a memorandum concluding that the site was unsuitable for earth work in winter, which memorandum was contrary to a geotechnical report which was provided and which did not accurately reveal the extent of the subsurface conditions, compounded by its direction to commence work in winter, amounted to an affirmative interference with the contractor's work which was "not reasonably contemplated by the parties in carrying out [their] contract, especially since contracts impose upon the parties an implicit duty of good faith and fair dealing." 920 A.2d at 987; see also, *Donahue v. Federal Express Corporation,* 753 A.2d 238, 242 (Pa. Super. 2000) ("Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.").

Here, the district knew, based on the contents of the narrative that grading of the project site was not feasible during the winter months. It also knew that it had not provided a copy of the narrative to any of the bidders, and that, in all probability, the information advising that the soil was unsuitable for winter grading was unknown to the contractors. The district further knew that it alone retained authority under the contract to determine when work would commence and that but for the delays in-

volved in securing contracts for the HVAC and plumbing work, construction would have begun earlier. Notwithstanding this knowledge, the district issued a notice to proceed in the middle of winter (*i.e.*, on February 4, 2002), which required the contractors to commence site grading within 10 days.

In doing so, the district virtually assured that difficulties and delays would be encountered. This was compounded by the district after it was informed by Mar-Paul of the wet conditions when its architect was unhelpful and slow to respond, arguably in violation of its contractual duties, only adding to the delay which could have been avoided had United's initial recommendation of overexcavation been approved. The contractors also contend that underlying the architect's decisions was a singular desire to avoid the additional costs associated with overexcavation, which in the end, created an even greater expense in costs and delays. If these facts— presented in the light most favorable to the contractors— are accepted, they would support a finding that the district affirmatively interfered with work Mar-Paul was contractually obligated to perform and failed to act on an essential matter necessary for Mar-Paul's timely prosecution of such work.

### 3) Cause of Delay

Likewise, Popple's related and dependent claim for idle equipment due to the underlying soil conditions cannot be resolved by summary judgment. In order to recover against a governmental entity for an alleged compensable delay, the contractor must prove: (1) the extent of the delay within a reasonable degree of accu-

racy; (2) the delay was caused solely by the government's actions; and (3) the delay caused specific, quantifiable injury to the contractor.

"A contractor must show the government was the 'sole proximate cause' of the delay and no concurrent cause would have equally delayed the contract, regardless of the government's action or inaction. 'Only if the delay was caused *solely* by the government will the contractor be entitled to . . . recovery of excess costs associated with the delay.' A 'court [will] award delay damages only for the unreasonable portion of a government-caused delay.'" *A.G. Cullen Construction Inc. v. State System of Higher Education,* 898 A.2d 1145, 1160 (Pa. Commw. 2006) (citations omitted) (quotations and emphasis in original). The burden of establishing these factors is upon the contractor. *Id.*

As already discussed, the assignment of responsibility for the delay attributable to the soil conditions is not clear-cut. Nor does *A.G. Cullen Construction Inc.* require that the government be the exclusive cause of all delay for delay damages to be recoverable by a contractor. It is sufficient if a specific, definable period of delay attributable solely to the district is established. *Id.* at 1161. "[W]here each party bears responsibility for a portion of the total project delay, the plaintiff must prove how the lump sum of extra cost can be broken down and assigned to the responsible party." *Id.* Moreover, neither Mar-Paul nor Popple is requesting damages solely attributable to delay; each has set forth claims based upon actual and estimated direct costs for extra work in addition to delay-related damages resulting from the subsurface soil conditions.

### B. *Preservation of Claim—Contract Procedures*

Whether viewed as a request for additional compensation because their efforts to remediate the underlying soil conditions required more work than Mar-Paul was already obligated to perform under the contract, or as a measure of damages for the district's failure to disclose information it was legally bound to disclose, the district argues any right to a recovery has been lost by Mar-Paul's failure to follow contract procedures. If recovery is premised on performing additional work not contemplated in the contract documents, the contract requires a change order as a prerequisite to recovery. "Changes," as this term is used in the contract, refers to work that the architect, owner, and contractor all acknowledge and agree is a change to the contractor's work. See General conditions, Changes in the work, ¶7.1.2. When the basis for recovery cannot be agreed upon, it is considered a "claim." See General conditions, Administration of the contract, ¶4.3.1.

The contract provides "Changes in the work may be accomplished after execution of the contract, and without invalidating the contract, by change order, construction change directive or order for a minor change in the work, subject to the limitations stated in this article 7 and elsewhere in the contract documents." [16] General conditions,

---

16. A Change order is a written instrument prepared by the architect and signed by the owner, contractor and architect, stating their agreement upon all of the following:

".1 change in the work;

".2 the amount of the adjustment, if any, in the contract sum; and

".3 the extent of the adjustment, if any, in the contract time." General conditions, Changes in the work, ¶7.2.1.

Changes in the work, ¶7.1.1. No change order or construction change directive was ever issued or signed by the district or the architect for changes in the work due to soil conditions. In consequence, the district argues Mar-Paul has forfeited any rights it may have had to be paid additional monies for extra work performed because of the moisture content of the subgrade soils. "Where a public contract states the procedure in regard to work change and extras, claims for extras will not be allowed unless these provisions have been strictly followed." *Nether Providence Township School Authority v. Thomas M. Durkin & Sons Inc.,* 505 Pa. 42, 47, 476 A.2d 904, 906-907 (1984).

The district's current position, to label the contractors' claim as one requiring a change order, is different from that taken earlier when Mar-Paul and Popple first asserted that the excessive moisture content of the site's subgrade soils was affecting Popple's ability to proceed with its work. Starting with Popple's letter of March 13, 2002 and Mar-Paul's notice to the architect eight days later, and proceeding through the March 22, 2002 recommendation of United to remove and replace the unsuitable soil with stone and geogrid and the March 25, 2002 proposal by Popple to perform the work described in United's recommendation, the district's architect refused to acknowledge or approve the need for additional work to remedy the problem. Instead, in its letter dated April 4, 2002, the architect expressly treated the contractors' response to United's recommendation as a claim. See *supra* notes 3 and 5 and accompanying text. Later, in its letter dated April 29, 2002, following United's April 9, 2002 reevaluation which recommended either removal

and replacement of soil or air-drying the existing soil, the architect wrote that there was "no basis to recommend that a change order be issued for either option." As is evident from this exchange, Mar-Paul's request is properly classified as a claim, the parties being in disagreement as to whether the work performed by Mar-Paul and Popple to remediate the soil conditions between March and May of 2002 constitutes additional work beyond that contracted for, for which additional compensation is due.[17]

As a claim, under the dispute provisions of the contract, Mar-Paul's only contractual obligation is to "initiate" it in writing to the architect and the district "within 21 days after occurrence of the event giving rise to such claim or within 21 days after the claimant first recognizes the condition giving rise to the claim, whichever

---

17. The contract defines a "claim" as:

"[A] demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of contract terms, payment of money, extension of time or other relief with respect to the terms of the contract. The term 'claim' also includes other disputes and matters in question between the owner and contractor arising out of or relating to the contract." General conditions, Administration of the contract, ¶4.3.1.

Unlike the contract in *Nether Providence Township School Authority v. Thomas M. Durkin & Sons Inc.,* 505 Pa. 42, 476 A.2d 904 (1984), the contract documents in this case distinguish between "changes" and "claims" and contain specific procedures relative to each. Articles 4.3 and 4.4 of the General conditions, governing "claims and disputes" and "resolution of claims and disputes," respectively, set forth specific procedures for making, resolving, and determining "claims," distinct from the procedures for "changes", which, as discussed earlier, are premised on an acknowledgement and agreement by the owner, the contractor, and the architect that there has been a change in the contractor's work. See General conditions, Changes in the work, ¶7.1.2.

is later." General conditions, Administration of the contract, ¶4.3.2. The "event" giving rise to this claim is the excessive moisture content of the soil which Popple first documented in its letter of March 13, 2002. In accordance with subparagraph 4.3.2 of the General conditions, Mar-Paul was required to initiate a claim by written notice to the architect and the district within 21 days of March 13, 2002. See *Scott Township School District Authority v. Branna Construction Corporation,* 409 Pa. 136, 139, 185 A.2d 320, 322 (1962) (affirming dismissal of contractor's claim due to failure to adhere to contract procedures regarding work changes and extra compensation). But see *James Corporation v. North Allegheny School District,* 938 A.2d 474, 486-87 (Pa. Commw. 2007) (declining to require "[strict] and narrow application of the [contract's] notice requirements" where application "would be out of tune with the language and purpose of the notice provisions" and where "government is quite aware of the operative facts," and finding notice provisions were informally satisfied and school district suffered no prejudice from contractor's failure to submit written claim for damages pursuant to contract's notice provisions), *reargument denied,* (2008).

As has already been recited, Mar-Paul notified the architect and the district of the moisture problem in its letter dated March 21, 2002, followed on March 29, 2002, by a copy of Popple's proposal to perform the overexcavation, stone, and geogrid work. Although these documents do not quantify the amount of the claim, which information was not known until May 20, 2002, they do, at least arguably, meet the requirement of subparagraph 4.3.2 of the General conditions that the contractor initi-

ate the claim by written notice within 21 days of learning of the condition giving rise to the claim. Because the contract documents do not otherwise address how or when the contractor must substantiate the claim, we are unable to find as an undisputed matter of fact, that Mar-Paul's claim is untimely.

### C. *Popple's Crossclaims for Breach of Contract (Counts I and II)—Lack of Privity of Contract*

In Count I of Popple's new matter crossclaim against the district, Popple asserts a direct claim for breach of contract to recover for the costs of extra work performed due to the allegedly unexpected high moisture content of the soil and for delay damages measured by the cost of its idle equipment. In Count II of this new matter crossclaim, Popple asserts a direct claim against the district for breach of the duty of good faith and fair dealing and requests identical damages to those sought in Count I.

Popple is not a party to any contract with the district. Its only direct contractual relationship is with Mar-Paul, with whom it entered into a subcontract to perform the site work in question. As to both claims, the district seeks dismissal for lack of privity of contract.

"As a general rule, an action on a contract cannot be maintained against a person who is not a party to the contract unless the plaintiff is a third party beneficiary of the contract . . . ." *State Public School Building Authority v. Noble C. Quandel Co.,* 137 Pa. Commw. 252, 260, 585 A.2d 1136, 1140 (1991). (footnote omitted) A party does not become a third party beneficiary to a contract unless both parties to the contract so intend and

that intention is expressly indicated in the contract itself. See *Manor Junior College v. Kaller's Inc.,* 352 Pa. Super. 310, 313, 507 A.2d 1245, 1246 (1986).

Pursuant to the express provisions of the contract between Mar-Paul and the district, Popple is not a third party beneficiary. The contract provides:

"The contract documents form the contract for construction. The contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The contract may be amended or modified only by a modification. *The contract documents shall not be construed to create a contractual relationship of any kind* (1) between the architect and the contractor, (2) *between the owner and a subcontractor or sub-subcontractor,* (3) between the owner and architect or (4) between any persons or entities other than the owner and contractor. The architect shall, however, be entitled to performance and enforcement of obligations under the contract intended to facilitate performance of the architect's duties." General conditions, General provisions, ¶1.1.2. (emphasis added) "Such exculpatory clauses in contracts have been held to be dispositive by the courts in this Commonwealth for rejecting third-party beneficiary claims asserted by subcontractors for unpaid materials or services." *Buttonwood Company Inc. v. E. Clifford Durell & Sons Inc.,* 34 Phila. 193, 207 (1997) (citing *Demharter v. First Federal Savings & Loan Association,* 412 Pa. 142, 152-53, 194 A.2d 214, 219 (1963)).

In accordance with the foregoing, Popple's new matter crossclaims for breach of contract and breach of the

duty of good faith and fair dealing against the district cannot be maintained and will be dismissed.[18]

### D. *Popple's Crossclaims Under the Pennsylvania Contracts for Public Works Act (Counts VI and IX)— Lack of Privity of Contract With the District*

Counts VI and IX of Popple's new matter crossclaim against the district assert direct claims for violation of

18. Nor will the facts of record sustain Counts VII and VIII of Popple's new matter crossclaim. A contract implied-in-fact "is an actual contract which arises when parties agree upon the obligation to be incurred, but their intention is not expressed in words and is, instead, inferred from their actions in light of the surrounding circumstances." *Green Valley Dry Cleaners Inc. v. Westmoreland Company Industrial Development Corp.*, 832 A.2d 1143, 1156 (Pa. Commw. 2003), *appeal denied*, 578 Pa. 697, 851 A.2d 143 (2004). Popple's contract, in this case, was with Mar-Paul; no direct contractual relationship existed between Popple and the district.

Popple's claim for quantum meruit, as an implied-in-law contract, is equally unsustainable. The sine qua non of a claim for quantum meruit is unjust enrichment: there must be enrichment (*i.e.,* a benefit conferred) and it must be unjust. See *Torchia v. Torchia*, 346 Pa. Super. 229, 233, 499 A.2d 581, 582 (1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.' "). "Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." *Limbach Co.*, 905 A.2d at 575.

As applied to a traditional construction contract which involves the owner of the project, a general contractor, and one or more subcontractors, a subcontractor who seeks payment directly from the owner for services and materials provided under a theory of unjust enrichment must establish (1) a benefit conferred on the owner, which for purposes of unjust enrichment, is measured by the value of the benefit to the owner, rather than the value of or expense to the subcontractor of the labor and materials supplied and (2) misleading or other conduct by the owner which, under the circumstances, would cause the owner's

the Pennsylvania Contracts for Public Works Act, 62 Pa.C.S. §§3901-3942 (Public Works Act). As with contractual claims generally, the Public Works Act only provides for recovery by a contractor that contracts directly with a government agency. 62 Pa.C.S. §§3931, 3933, 3939. Since Popple was expressly excluded as a party to Mar-Paul's contract with the district, these claims are not sustainable and will be dismissed.

### E. *Measure of Damages*

The duty and burden of establishing damages by evidence sufficient to "furnish a basis for the legal assessment of damages according to some definite and legal rule" is upon the claimant. *Tyus v. Resta,* 328 Pa. Super. 11, 29, 476 A.2d 427, 436 (1984).

---

retention of the benefit without paying any compensation to the subcontractor to be unjust. See *D.A. Hill Co. v. CleveTrust Realty Investors,* 524 Pa. 425, 432, 573 A.2d 1005, 1009 (1990); see also, *Buttonwood Company Inc. v. E. Clifford Durell & Sons Inc.,* 34 Phila. 193, 201 (1997).

Here, Popple has presented no evidence that the value of the project to the district was any greater because of its services than what the district contracted for and paid for. As to the second prong, there is no evidence of record that the district has been *unjustly* enriched, or that it misled or dealt directly with Popple. Under the contractual arrangement which existed between the parties—keeping in mind that by law the project was required to be bid—the contract which created the district's right to enforce performance was that which existed between it and Mar-Paul, who separately contracted out the site work to Popple. Under this contractual chain, the district's directives were relayed to Mar-Paul who, in turn, directed Popple. See General conditions, Subcontractors, ¶5.3.1. To the extent the availability of United's report combined with the withholding of the narrative constitutes a misrepresentation, this representation was directed to those bidding on the project; the record is devoid of any evidence that Popple received or relied upon such representation independently of Mar-Paul.

"Pennsylvania law does not require proof of damages to a mathematical certainty. . . . Rather, evidence of damages may consist of probabilities and inferences as long as the amount is shown with reasonable certainty. . . . To prove damages, however, a plaintiff must present sufficient evidence for the fact-finder to make an intelligent estimation, without conjecture, of the amount to be awarded. . . ." *A.G. Cullen Construction Inc.,* 898 A.2d at 1160-61. (citations omitted) "[I]f the facts afford a reasonably fair basis for calculating the amount to which plaintiff is entitled, such evidence cannot be regarded as legally insufficient to support a claim for damages." *Acchione,* 501 Pa. at 344-45, 461 A.2d at 769.

To a certain extent, the parties may also agree to limit or define how damages will be measured. Cf. *A.G. Cullen Construction Inc.,* 898 A.2d at 1161-62 (discussing the purpose and enforceability of liquidated damage clauses). In this case, the district claims that by incorporating PennDOT Publication 408 into the contract, the parties agreed not to use Blue Book Rental values as a means of measuring the cost of idle equipment attributable to any delay for which the district is responsible. See section 01425, Reference Standards, ¶2.01(A)(6) and section 02215, Sedimentation and erosion control, ¶1.03(B). As to this limitation, the district relies upon the following language in Publication 408:

"When measuring additional equipment expenses (*i.e.,* ownership expenses) arising as a direct result of a delay caused by the department, *do not use in any way the Blue Book* or any other rental rate book similar thereto. *Use actual records* kept in the usual course of business, and measure increased ownership expenses pursuant to gen-

erally accepted accounting principles." PennDOT Publication 408, section 111.04(d). (emphasis added) This language, according to the district, requires that Popple's loss for idle equipment be derived from real equipment cost information using actual records kept in the usual course of its business and computed pursuant to generally accepted accounting principles. According to the district, Popple's losses for idle equipment are therefore limited to $8,319.19, the total amount of actual equipment costs it is able to document.

In response, Popple claims that the foregoing is a payment provision which the parties agreed to exclude from their incorporation of PennDOT Publication 408. To support this position, Popple refers to the following language in the contract:

"The 'PDT sections' noted herein refer to sections contained in the Commonwealth of Pennsylvania Department of Transportation Specifications Publication 408, latest edition. The references pertain only to materials, construction, equipment, methods and labor. The payment provisions do not apply to work to be performed under this contract." Section 02535, Traffic control signs, ¶1.03(A).

This language, as indicated, is under that section of the contract dealing with traffic control signs. To further complicate this issue, section 110 of Publication 408 is entitled "payment", whereas section 111, under which section 111.04(d) appears, is entitled "delay claims."

As more fully presented, the issue has three subparts: (1) whether the incorporation of Publication 408 applies to the type of work which is in dispute in this litigation;

if it does (2) whether section 02535 also applies; and if so, (3) whether the parties' reference to the payment provisions of Publication 408 in this section of their contract was intended to be specific and precise—to exclude section 110 only—or to be more generic and to exclude any provision which involves the payment of money, including those related to delay damages. The facts necessary to decide this issue are not so clear on the record before us that reasonable minds cannot differ, a requirement for summary judgment. See *Yocca v. Pittsburgh Steelers Sports Inc.,* 578 Pa. 479, 499, 854 A.2d 425, 437 (2004) ("[W]here a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." (quotation marks omitted)); see also, *Kohn v. Kohn,* 242 Pa. Super. 435, 443, 364 A.2d 350, 354 (1976) (holding that for parol evidence to be admissible on the basis of ambiguity, the ambiguity need not appear on the face of the written agreement; "extrinsic facts and circumstances may be proved to show that language apparently clear and unambiguous on its face is, in fact, latently ambiguous").

## F. *Mitigation of Damages*

On this issue, the district argues that if it is responsible for delay damages, Popple could have and should have mitigated its loss for idle equipment. See *Gaylord Builders Inc. v. Richmond Metal Mfg. Corp.,* 186 Pa. Super. 101, 104, 140 A.2d 358, 359-60 (1958) (holding that a claimant may recover only those damages that could not,

with reasonable effort, be avoided). This duty to mitigate is judged by a standard of reasonableness "determined from all the facts and circumstances . . . and must be judged in the light of one viewing the situation at the time the problem was presented." *Toyota Indus. Trucks U.S.A. Inc. v. Citizens Nat. Bank of Evans City,* 611 F.2d 465, 471 (3d Cir. 1979). "[T]he burden is on the party who breaches the contract to show how further loss could have been avoided through the reasonable efforts of the injured party." *Pontiere v. James Dinert Inc.,* 426 Pa. Super. 576, 587, 627 A.2d 1204, 1209 (1993), *appeal denied,* 537 Pa. 623, 641 A.2d 588 (1994).

Whether Popple failed to exercise reasonable efforts to mitigate its damages is a question of fact. Neither this question nor the one which underlies it—whether the district breached the contract—can be decided at this stage of the proceedings given the number of critical facts in dispute.

### G. *Popple's Counterclaim for Declaratory Judgment (Count IV)*

In Count IV of Popple's counterclaim against Mar-Paul, Popple seeks compensation from Mar-Paul for the same soil delay claims Mar-Paul has asserted on behalf of Popple in Mar-Paul's complaint against the district, Counts III and IV, plus an additional $123,627. The claims made by Mar-Paul, as previously discussed, arise from the pass-through provisions of its contract with Popple. See *supra,* note 10.

In Mar-Paul's cross-motion for partial summary judgment against Popple, Mar-Paul asks for summary judg-

ment in the event we find that the district is entitled to summary judgment on all or part of the soil delay claims made by Mar-Paul on Popple's behalf since, to that extent, we will have determined that Mar-Paul is not entitled to recover on Popple's behalf. Under paragraph 17 of the subcontract, Popple agreed that it would "not be entitled to nor claim any cost reimbursement, compensation, or damages for any delay, obstruction, hindrance or interference to the *work except to the extent that contractor is entitled* to corresponding cost reimbursement, compensation or damages from owner . . . ." (emphasis added)

Because we have denied the district's motion for partial summary judgment with respect to Counts III and IV of Mar-Paul's complaint, we likewise deny Mar-Paul's motion for partial summary judgment as to Count IV of Popple's counterclaim.

## III. CONCLUSION

In accordance with the foregoing, the district's motion for partial summary judgment has been granted with respect to Counts I, II, VI, VII, VIII and IX of Popple's new matter counterclaim. In all other respects, the district's motion for partial summary judgment has been denied, as has Mar-Paul's cross-motion for partial summary judgment.